PITTSBURGH PLATE GLASS COMPANY v. PAINE & NIXON COMPANY.[1]

No. 28,095.

December 26, 1930.

[1]Reported in 234 N. W. 453.

*Fryberger, Fulton & Boyle,* for appellant.

*Robert M. Works, Mitchell, Gillette & Carmichael,* and *James J. Nye,* for respondent.

WILSON, C. J.

Plaintiff sued to recover $3,676.44. The answer admitted plaintiff's cause of action but pleaded a counterclaim, which the jury allowed in the sum of $775 and deducted that amount in fixing the verdict for plaintiff.

Defendant appealed from a judgment entered pursuant to an order granting plaintiff's motion for judgment non obstante for the full amount of plaintiff's claim or a new trial.

We are concerned with the counterclaim only. It rests in an oral contract which plaintiff says is illegal because it is in restraint of trade in violation of G. S. 1923 (2 Mason, 1927) § 10463.

Plaintiff is a manufacturer and jobber of glass. It carried a stock in a warehouse in Duluth and sometimes did contract work there, which it desired to discontinue. Defendant, the Lowry Company, and some 15 other concerns were local contractors, using materials of the character handled by plaintiff. The local market for glass had not been satisfactory. Defendant and the Lowry Company were apparently the leading local dealers. They perhaps did most of the local business. The volume of defendant's total annual business was about twice that of the Lowry Company.

The agreement was this: Plaintiff should cease to solicit contract work in the city of Duluth; it would sell its goods to no contractor or dealer in the city except these two; and when local jobs

came to plaintiff without solicitation it would take them and then pay to these two contractors the usual profit on the basis of one-third to the Lowry Company and two-thirds to defendant. This so-called profit, so payable by plaintiff, was not its actual profit, but was the spread or difference between the usual cost to a contractor and the cost to a consumer. Such amounts were payable on the basis mentioned so long as they maintained their relative amount of business. If the Lowry Company was behind in getting its one-third share of contract work the so-called profit would go to it until its one-third share of the business was made up, and the balance, if any, would be divided between the two contractors in said proportions, to-wit, one-third to the Lowry Company and two-thirds to defendant; or if defendant had not received its two-thirds of the contract work involving plaintiff's product, the profit would be paid to defendant until its two-thirds of the business was made up, and the balance, if any, would be divided in the same proportions. Always the one behind was to be favored; otherwise the division was simple.

These two contractors or dealers agreed that they would buy from plaintiff its product to the extent of 50 per cent of their total joint necessities, 33 1/3 per cent of the 50 per cent was to be bought by the Lowry Company and the other 16 2/3 per cent of the 50 per cent was to be bought by defendant. If defendant did two-thirds of the business it got two-thirds of the profit or loss. If the Lowry Company did one-third of the business it would get the profit or loss on that. There was no pooling of interest. There was no agreement for paying any money between the two. There was no definite agreement for any adjustment between the two dealers if the application of the money paid by plaintiff was inadequate.

■ The foregoing seems to be a complete statement of the agreement. Respondent attempts to read into the agreement a further element relating to the adjustment between the two dealers relative to each of them getting its proportion of the work. It argues that in the cross-examination of the witness C. S. Nixon it is made to

appear that the arrangement under the contract involved the secret, unlawful manipulation of figures submitted by these two dealers on competitive bids in relation to the maintenance of the estimated percentages of business which each was supposed to enjoy. The president of the Lowry Company testified that there was an arrangement between the two dealers, to which plaintiff was not a party, by which, on the total contract work had by the two firms, his firm was to have one-third of the business and defendant two-thirds. It seemed to be recognized by all concerned that this percentage was the relative standing of the two concerns in their normal operations. This witness testified that the adjustment "could not be worked out perfectly" but that the percentage of work to be done was based upon the size of the concerns. The law of averages may have answered. We can only say that the record does not satisfactorily disclose the nature and the extent of any adjustment had or contemplated by and between the two dealers. Apparently in realization that the maintenance of this relative standing was to some extent problematical, it was agreed that the one falling short was to receive the money coming from the work done by plaintiff. So far as the agreement goes, the volume of business acquired by either dealer depended upon competitive bidding, or the good fortune of either concern getting business without having to bid for it. The agreement had no reference to the fixing of prices. If it may be said that the evidence is quite convincing that some kind of an understanding existed between the two in relation to their competitive bids, it is equally clear that the plaintiff was not a party thereto; nor can we determine from the record the terms of any such agreement. It is a rule of law that contracts should be so construed as to uphold rather than defeat them. It is to be presumed that they were intended to be legal. We are of the opinion that the evidence fails to establish the alleged arrangement between the two dealers as a part of the contract involved.

■ G. S. 1923 (2 Mason, 1927) § 10463, in its portions here important reads as follows:

"No person * * * shall enter into any * * * understanding whatsoever with any other person * * * in restraint of trade * * .* or which tends in any way or degree to limit, fix, control, maintain or regulate the price of any article of trade, manufacture, or use * * * or which prevents or limits competition in the purchase or sale thereof, or which tends or is designed so to do. * * *"

Is the agreement in violation of this statute? Technically it is. Plaintiff's withdrawal from the local field is that. The selling of its products to two dealers only, excluding all other dealers, is also a restraint of trade. In the same two ways it limited competition. Whatever is in restraint of trade prevents competition, and whatever prevents competition in trade is necessarily in restraint of trade. The learned trial court consciously placed a strict construction upon the statute, as indicated in its memorandum, "in favor of construing legislative enactments as they are written" to the exclusion of the more liberal construction known as the "rule of reason."

In State v. Duluth Board of Trade, 107 Minn. 506, 121 N. W. 395, 410, 23 L.R.A.(N.S.) 1260, it was recognized that it was not the purpose of such a statute as this to hinder or prohibit contracts on the part of corporations or individuals made to foster or increase trade or business; and the view was substantially stated therein that a contract may incidentally restrain competition or trade without violating the statute if its chief purpose is to promote and increase the business of those who enter into it and if it is not injurious to the public interests. We quote also from the Duluth Board of Trade case as follows [107 Minn. 543] :

"Combinations between individuals or firms for the regulation of prices or competition in business are held not to be monopolies and in restraint of trade so long as they are reasonable and do not include all the commodity or trade, or to create such restrictions as to materially affect the freedom of commerce. * * *

"But it does not follow that every contract or combination which in any degree tends to restrict competition is illegal. So strict a

rule would invalidate innumerable ordinary business transactions, which are unobjectionable and necessary that business shall not completely stagnate. * * * The anti-trust statutes were never designed to forbid such transactions, and it has been universally held that contracts and combinations which tend to promote business, and which only remotely, incidentally, and indirectly restrain competition, are not forbidden. If the necessary effect of the combination is to stifle or to directly or necessarily restrict free competition, it is under the ban of the law, whatever may have been the intention of the parties. But if 'it promotes or but incidentally or indirectly restricts competition, while its main purpose and chief effect, are to foster the trade and to increase the business of those who make and operate it, then it is not a contract, combination, or conspiracy in restraint of trade, within the true interpretation of this act, and it is not subject to its denunciation.' "

Many authorities and writers state that the earlier decisions of the United States Supreme Court favored a strict construction of such a statute. 19 R. C. L. 67; 41 C. J. 109, § 70. See U. S. v. Trans-Missouri F. Assn. 166 U. S. 290, 17 S. Ct. 540, 41 L. ed. 1007; Northern Securities Co. v. U. S. 193 U. S. 197, 331, 24 S. Ct. 436, 48 L. ed. 679. Chief Justice White in the Standard Oil case, 221 U. S. 1, 31 S. Ct. 502, 55 L. ed. 619, 34 L.R.A. (N.S.) 834, Ann Cas. 1912D, 734, attempts to harmonize the earlier decisions with the conclusion then reached. The decisions of the United States Supreme Court, in and since the year 1910, firmly establish the holding that the federal statute prohibits any acts, contracts, agreements, or combinations which operate to the prejudice of public interests by unduly restricting competition or unduly obstructing the due course of trade, or which, either because of their inherent nature or effect or because of the evident purpose of the acts, injuriously and unreasonably restrict trade. Such statutes aim at the unlawful restraint. They are to protect and not destroy the rights of property. The "rule of reason" now prevails. In fact our attention has not been directed to the decision of any court holding to the contrary since the decision in the Standard Oil case. Standard Oil

Co. v. U. S. 221 U. S. 1, 31 S. Ct. 502, 55 L. ed. 619, 34 L.R.A. (N.S.) 834, Ann. Cas. 1912D, 734; U. S. v. American Tobacco Co. 221 U. S. 106, 31 S. Ct. 632, 55 L. ed. 663; U. S. v. Terminal R. Assn. 224 U. S. 383, 32 S. Ct. 507, 56 L. ed. 810; U. S. v. Union Pacific R. Co. 226 U. S. 61, 33 S. Ct. 53, 57 L. ed. 124; U. S. v. Reading Co. 226 U. S. 324, 33 S. Ct. 90, 57 L. ed. 243; Eastern States R. L. D. Assn. v. U. S. 234 U. S. 600, 34 S. Ct. 951, 58 L. ed. 1490, L. R. A. 1915A, 788; note, 64 L. R. A. 698; Chicago Board of Trade v. U. S. 246 U. S. 231, 38 S. Ct. 242, 62 L. ed. 683; U. S. v. U. S. Steel Corp. 251 U. S. 417, 40 S. Ct. 293, 64 L. ed. 343, 8 A. L. R. 1121; Maple Flooring Mfrs. Assn. v. U. S. 268 U. S. 563, 577, 45 S. Ct. 578, 592, 69 L. ed. 1093; U. S. v. International Harv. Co. 274 U. S. 693, 47 S. Ct. 748, 71 L. ed. 1302; International Shoe Co. v. Federal Trade Comm. 280 U. S. 291, 50 S. Ct. 89, 74 L. ed. 431.

The "rule of reason" is a wholesome construction and does not narrow the statute. It leaves it sufficiently flexible to include and reach conduct that might be beyond its reach under a strict construction. In every case where it is claimed that the statute has been violated "the rule of reason, in the light of the principles of law and the public policy which the act embodies, must be applied." The legal notion of what is reasonable restraint of trade varies from time to time according to our economic conditions. Every case of this character must be governed by its own facts. The "rule of reason" says that the court must determine whether or not the acts complained of have brought about the evils which the statute was enacted to prevent. If so, no subterfuge can legalize the conduct. The critics of the rule insist that the courts have read the words "undue" or "unreasonable" into the law. The language of this court in the Duluth Board of Trade case, 107 Minn. 506, 121 N. W. 395, 23 L.R.A. (N.S.) 1260, and the holdings of the more recent decisions of the United States Supreme Court, above cited, establish the rule to be that the legality of such an agreement depends on whether the restraint so imposed is reasonable or unreasonable. The development of the "rule of reason" was rather tumultuous. 39 Law Mag. & Rev. 177.

The history of our statute, except as to the amendment of 1923, is stated in the Duluth Board of Trade case, 107 Minn. 506, 121 N. W. 395, 23 L.R.A.(N.S.) 1260, wherein it is said that the general purpose of this statute is the same as the federal statute known as the Sherman Anti-Trust Act. 15 USCA, 3, c. 1, § 1; 26 St. 209, c. 647. The title of the Sherman law is: "An act to protect trade and commerce against unlawful restraint and monopolies." The word "unlawful" therein implies that there are lawful restraints. The title of our statute was not so worded, but it does permit, with the approval of the attorney general, one business concern to buy a competing business and merge it with its own, if not "unreasonable."

The judgment is reversed. The motion for a new trial is still pending.

DIBELL, STONE, and LORING, JJ. (dissenting).
We dissent.

UPON APPLICATION FOR REARGUMENT.

On January 23, 1931, the following opinion was filed:

WILSON, C. J.

The petition for reargument is denied. It was very appropriately filed. In writing the opinion in this case the consideration and discussion of respondent's briefed claim that the contract was void for lack of mutuality was inadvertently omitted.

The claim rests upon the case of Bailey v. Austrian, 19 Minn. 465 (535) wherein it was held that a contract, where one party to it agreed to purchase all of a certain material which he might want in his business during a certain time, was not valid for lack of mutuality. The theory was that there was no engagement to "want" any of such material and hence no agreement to purchase any. The promises were all on one side.

Bailey v. Austrian, 19 Minn. 465 (535) was followed in Tarbox v. Gotzian, 20 Minn. 122 (139). These two cases were distinguished in Minneapolis Mill Co. v. Goodnow, 40 Minn. 497, 42 N. W. 356, 4 L. R. A. 202, wherein it was said, under the circumstances and

facts therein involved, that the promise, supposed to be missing, was implied. The rule of law to the effect that there must be a mutuality of engagement in order to have a valid contract is well settled. This court has however drifted away from the construction put upon the facts in the Bailey case, 19 Minn. 465 (535). In the Goodnow case, 40 Minn. 497, 42 N. W. 356, 4 L. R. A. 202, we announced the rule of the implied promise. The reasoning in the Goodnow case was adopted as a part of the basis for the decision in Hoffman v. Maffioli, 104 Wis. 630, 80 N. W. 1032, 47 L. R. A. 427, which was quoted with approval in Rotzien-Furber Lbr. Co. v. Franson, 123 Minn. 122, 143 N. W. 253, wherein the rule is stated.

It was also said in Ames-Brooks Co. v. Aetna Ins. Co. 83 Minn. 346, 86 N. W. 344, that where the contract presupposes the continuance of the promisor's business it included by necessary intendment a promise on its part.

We are of the opinion that the contract in this case presupposed a continuance of the well established business of the appellant. City of Marshall v. Kalman, 153 Minn. 320, 190 N. W. 597; Trainor v. Buchanan Coal Co. 154 Minn. 204, 191 N. W. 431.

It is clear that if Bailey v. Austrian, 19 Minn. 465 (535) was before the court today we would hold that the promise to purchase the pig iron was present by implication and that the contract was based upon the mutual understanding that the well established business was to continue.