State Board of Examiners of Architects 119 State Services Building 1525 Sherman Street Denver, Colorado 80203
Gentlemen and Ms. Landeck:
QUESTION PRESENTED AND CONCLUSION
Can the Board of Architects promulgate and enforce a rule prohibiting competitive bidding by architects?
 My conclusion is the Board may not pass a rule prohibiting competitive bidding.
ANALYSIS
On August 29, 1975, upon the advice of the Attorney General's office, the Colorado State Board of Examiners of Architects (hereafter "the Board") agreed unanimously to repeal the following provision of rule IV, 1(b)(1) of its Rules and Regulations:
 Section IV DEFINITIONS: 1. . . .(b) Fraud or Deceit: (1) Any architect may be deemed guilty of fraud or deceit in his professional practice if he knowingly submits a bid for professional employment, or competes against another on the basis of professional charges. . . .
The remaining provisions of the rule were retained and reenacted as a "new temporary rule." The repeal of the provision cited became effective immediately for a 90 day emergency period, and a hearing was noticed for the purpose of determining whether the change should be made permanent. C.R.S. 1973, 24-4-103(6).
On October 17, 1975, at the hearing to consider the new rule, the Board reversed its previous action by a 4-1 vote and voted to reinstate rule IV, 1(b)(1) (hereafter "the rule") in its entirety. This opinion will evaluate the legality of the rule under Colorado and federal antitrust law and under Colorado constitutional law governing the delegation of legislative powers.
I. HISTORY OF THE RULE
Prior to 1973, the Board did not have a provision in its Rules and Regulations comparable to the rule in question. However, this same subject was treated by the Standards of Ethical Practices of the American Institute of Architects (hereafter "AIA") and its local state organizations, including the Colorado Society of Architects. In 1972, the United States Justice Department filed suit against the AIA challenging the propriety under the antitrust laws of certain ethical standards almost identical to those now contained in the rule of the Board.
On June 19, 1972, the AIA entered into a consent decree with the Justice Department which enjoined the AIA from adopting any rule which prohibits or limits the submission of price quotations for architectural services by its members or which states that such competition is unethical or unprofessional.United States v. American Institute of Architects, 1972 Trade Cas., § 73, 981 (D.D.C. 1972). The decree further provided that the AIA send a copy of the decree to each new member and, for a period of five years, publish in its Standards of Ethical Practice a statement that the submission of price quotations for architectural services is not unethical.[1] The Board's minutes reflect the fact that a short time after the promulgation of this consent decree the Board took the first steps towards adoption of the rule in question.
The rule presents three basic questions:
1. The propriety of the rule under federal antitrust law;
2. The propriety of the rule under Colorado antitrust law;
 3. The propriety of the rule under Colorado constitutional law regarding the delegation of legislative powers to state licensing boards.
This opinion will review the pertinent statutes and case law governing each of these questions in order to assess the legality of the rule.
II. THE PROPRIETY OF THE RULE UNDER FEDERAL ANTITRUST LAW
A.Price fixing under federal antitrust law
Section 1 of the Sherman Act, 15 U.S.C. § 1 (1973) provides as follows:
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal . . . .
Although the Act has been interpreted to prohibit only unreasonable restraints of trade, Standard Oil Co. v. United States, 221 U.S. 1
(1911), certain practices have been held to have such a pernicious effect on competition that they are always prohibited without any inquiry into the precise harm they cause or the business justifications advanced for their existence.Northern Pacific Railway Co. v. United States, 356 U.S. 1
(1958). One classic violation of the Sherman Act is price fixing.
Price fixing is one of the so-called "per se" violations and, as such, is always conclusively presumed to be unreasonable. United States v.McKesson Robbins, Inc., 351 U.S. 305 (1956). Evidence of ethical, economic, or other reasons to justify a particular price-fixing scheme has been held not to be relevant since the courts have universally refused to engage in a determination of "whether in particular settings price fixing serves an honorable or worthy end." United States v. Natl.Ass'n of Real Estate Boards, 339 U.S. 485, 489 (1950).
Price fixing, it should be noted, may occur even though competition is not completely eliminated. In other words the mere curtailment of competition is sufficient to constitute a violation of the Sherman Act if it is the result of an agreement among competitors to restrain competition by "raising, depressing, fixing, pegging, or stabilizing" prices. Socony-Vacuum Oil Co. v. United States, 310 U.S. 150, 223 (1940).
One form of price fixing which severely curtails competition is an agreement among competitors not to compete. Such agreements are "naked restraints of trade" which have consistently been held illegal even though they may be well-intended.United States v. Topco Associates,405 U.S. 596 (1972). The United States Supreme Court has repeatedly held that agreements to refrain from competitive bidding violate the Sherman Act. In Swift Co. v. United States, 196 U.S. 375 (1905), an agreement among meatpackers which prohibited their agents from bidding against one another at livestock sales was held to be a violation of the Sherman Act. In American Tobacco Co. v. United States, 328 U.S. 781 (1946), major tobacco companies were found guilty of violating the Sherman Act for agreeing, among other things, to limit competitive bidding at tobacco auctions.[2]
In recent years, the United States Justice Department has successfully brought suit to enjoin a number of professional societies from agreeing among themselves not to compete in price. See, e.g., United States v.National Society of Professional Engineers, 1974-2 Trade Cas. § 75, 415 (D.D.C. 1974), vacated and remanded "in light of Goldfarb v. VirginiaState Bar" (see discussion infra), 45 L.Ed.2d 686 (1975); United Statesv. American Society of Civil Engineers, 1972 Trade Cas., § 73, 950 (S.D.N.Y. 1972); United States v. American Institute of Certified PublicAccountants, 1972 Trade Cas., § 74,007 (D.D.C. 1972).
Despite these rather clear prohibitions, certain professional associations continue to argue that the antitrust laws do not prohibit them from undertaking similar activities. They attempt to support their position with two arguments: (1) the activities in which they are engaged do not constitute "trade or commerce" within the meaning of the Sherman Act (the so-called "learned profession" exemption); (2) the activities are carried on under the auspices of a state regulatory agency and therefore are not subject to antitrust scrutiny (the so-called "state action" immunity). The first of these arguments has been totally eliminated and the second severely undercut by the United States Supreme Court's recent decision in Goldfarb v. Virginia State Bar, 421 U.S. 773
(1975).
B.The "Learned Profession" Argument
In the Goldfarb case, a Fairfax County, Virginia couple wished to hire an attorney to perform a real estate title examination. Every attorney they contacted refused to charge a fee less than the minimum fee for this service prescribed by the county bar association. The defendants argued that the legal profession constituted a "learned profession" not subject to the antitrust laws and that therefore their anticompetitive conduct did not constitute price fixing. The Supreme Court rejected the argument that there was a "learned profession" exemption from the antitrust laws. The Court found that the services of a lawyer are "trade or commerce" as those terms are used in the Sherman Act and Congress never intended a sweeping exclusion of professional services from antitrust attack. The federal act, the Court reaffirmed, shows a "carefully studied attempt to bring within the Act every person engaged in business whose activities might restrain or monopolize commercial intercourse among the states." 421 U.S. at 787-788, citing United States v. South-EasternUnderwriters Ass'n., 322 U.S. 533 (1944). The minimum fee schedule of the Virginia bar was therefore, in the words of the Court, "a classic illustration of price fixing." 421 U.S. at 783.
Prior to the United States Supreme Court's decision in Goldfarb, a District of Columbia court had taken an identical position regarding professional engineers.United States v. Natl. Society of ProfessionalEngineers, 1974-2 Trade Cas., § 75, 415 (D.D.C. 1974), vacated andremanded "for further consideration in light of Goldfarb v. VirginiaState Bar," 45 L.Ed.2d 686 (1975). In that case the court enjoined a provision of the Engineers' Code of Professional Ethics which prohibited members from engaging in any form of price competition or from accepting work at a fee below "accepted standards" in the area. The court found that the business aspects of engineering services, including "prefeasibility studies, feasibility studies, planning, preliminary studies, the preparation of drawings, plans, designs, specifications, cost estimates, manuals, and reports, consultations, surveys, and inspections" constituted clear evidence that engineering services are within the trade or commerce clause of the Sherman Act.1974-2 Trade Cas. at 98,375.[3]
In light of the foregoing, it is clear that the so-called learned profession argument no longer exists. In a recent statement, Thomas E. Kauper, the Assistant Attorney General in charge of the Antitrust Division of the United States Justice Department, concluded that theGoldfarb decision is a "clear, unequivocal, and unanimous" rejection of the notion that learned professions are exempt from the antitrust laws. Because the question is no longer debatable, Kauper stated "(p)rofessional organizations that do not conform their conduct to the dictates of the Goldfarb decision run a substantial risk of antitrust prosecution." Address by Thomas E. Kauper, Oregon Bar Conference on Federal and State Antitrust Enforcement, October 24, 1975.
C.The "State Action" Argument
The classic statement of the "state action" exemption under the antitrust laws is set forth in Parker v. Brown, 317 U.S. 341 (1943). In Parker, the California legislature had passed the California Agricultural Prorate Act which, among other things, created a complex regulatory scheme which fixed the price of raisins. The Supreme Court held that in adopting the regulatory scheme the State was acting as a sovereign and was therefore immune from the federal antitrust laws. 317 U.S. at 351. In Parker the California legislature determined that competition in the raisin industry had to be replaced by some form of economic regulation other than the antitrust laws. Moreover, officials of the United States Department of Agriculture collaborated with California officials in formulating the program, which was consistent with the Federal Agricultural Adjustment Act and the Agricultural Marketing Agreement Act. Thus, the exemption inParker involved a broad program which "derived its authority and its efficacy from the legislative command of the state." 317 U.S. at 340.
In Goldfarb, the Virginia State Bar, an administrative agency of the Virginia Supreme Court, had issued minimum fee schedule reports and ethical opinions providing, among other things, that a lawyer might be disciplined for habitually charging less than the minimum fee schedule of his county bar association. Counsel for the defendants strenuously argued that these facts precluded application of the antitrust laws, citing theParker rule. However, Chief Justice Burger pointed out that under theParker rule anticompetitive activities must be "compelled" by sovereign state directive to be immune from the antitrust laws. The mere fact that an entity is a state agency for some limited purposes, he wrote, "does not create an antitrust shield that allows it to foster anticompetitive practices for the benefit of its members." 421 U.S. at 791.
Thus, it is clear that no immunity exists under the federal antitrust laws simply because a state agency is involved.[4]
The current trend is to scrutinize very carefully the conduct of governmental agencies and officials to see if their conduct constitutes cooperation in private restraints of trade rather than legitimate governmental action. For example, in Hecht v. Pro Football, Inc.,444 F.2d 931 (D.C. Cir. 1971), cert. denied, 404 U.S. 1047 (1972), the court held that state action did not immunize a monopolistic lease of a football stadium from the antitrust laws, even though the lease had been obtained from the District of Columbia armory, a government agency acting pursuant to a congressional mandate to maintain and operate the stadium. The court said the proper inquiry is the extent to which the governmental body knowingly adopted a policy contrary to or inconsistent with the antitrust law.
In Duke Co., Inc. v. Foerster, 1975-2 Trade Cas., § 60,433 (3d Cir. 1975), the Third Circuit held that public officials may be liable for participating in anticompetitive behavior which is not directed by the state acting as a sovereign. In Duke, plaintiff alleged that three municipal corporations, three private corporations, and a county commissioner conspired to boycott his malt beverage products at public facilities in Pittsburgh. The District Court dismissed the government defendants on the basis of the Parker immunity doctrine. The Court of Appeals reversed on the grounds that there was no state directive allowing the alleged boycott:
 Under the standards enunciated in Parker and Goldfarb, we conclude that this is not a case where Parker-type immunity should be extended to state governmental entities. We see no basis in the relevant provisions of the Pennsylvania Statutes for concluding that the anticompetitive activities alleged by plaintiff were "compelled by direction of the State acting as a sovereign." Goldfarb, supra, at 4729. As in Goldfarb, defendants here have pointed to no statute which would compel or even permit the boycott that plaintiff alleged took place.
1975-2 Trade Cas., at 66,914. Because the statute was silent on the activities in question, no state action immunity was available.
The First Circuit had earlier taken a similar position in a case involving a private contractor who sought antitrust immunity because he was acting under a Massachusetts competitive bidding program.Whitten v.Paddock Pool Builders, Inc., 424 F.2d 25 (1970), cert. denied,400 U.S. 850. The court stated:
 Our reading of Parker convinces us that valid governmental action confers antitrust immunity only when government determines that competition is not the summum bonum in a particular field and deliberately attempts to provide an alternate form of public regulation.
The rationale of these cases is reflected in guidelines announced by the United States Justice Department. The Department contends that a state regulatory scheme can escape antitrust scrutiny only if (a) the state has specifically mandated and delineated its policy by statute, (b) the state has a legitimate local purpose for limiting competition, and (c) the limitation on competition does not exceed what is necessary to carry out that purpose (i.e., no less restrictive alternative is available). Address by Roland W. Donnem, Director of Policy Planning, United States Department of Justice, Antitrust Division, before the Sherman Act Committee of the American Bar Association, August 10, 1970.
There is nothing in the laws governing architects and establishing the Board, C.R.S. 1973, 12-4-101 et seq., which can be read to authorize or encourage anticompetitive activities among architects. Nor is there any indication that a deliberate choice was made to replace the state or federal antitrust laws in this regard. Under these circumstances, the Supreme Court's outright rejection of the "learned profession" argument and the limitations placed on the "state action" doctrine indicate that the rule constitutes a violation of the federal antitrust laws.
III. THE PROPRIETY OF THE RULE UNDER COLORADO ANTITRUST LAW
The Colorado antitrust statute, C.R.S. 1973, 6-4-101, reads, in relevant part, as follows:
 Every contract or combination in the nature of a trust or conspiracy in restraint of trade or commerce is declared illegal.
This statute was modeled upon the Wisconsin Trusts and Monopolies statute, 20 W. S.A. 133.01 et seq. (1957). Both laws are generally described as "baby" Sherman Acts, to reflect the fact that they are modeled upon, and closely resemble, their federal counterpart,15 U.S.C. § 1 et seq. While there are no Colorado cases interpreting the present Colorado antitrust statute, Wisconsin has consistently held that federal cases interpreting the Sherman Act ought to be applicable to interpretation of the state law.Pulp Wood Co. v. Green Bay Paper andFiber Co., 157 Wis. 604, 147 N.W. 1058 (1914), cert. denied, 249 U.S. 610
(1919); City of Madison v. H. J. Pertzborn Plumbing and Heating Corp., Wisc., No. 140-428 (Dane Cty. Cir. Ct., July 17, 1975).
The court in Pulp Wood held that the state law "should receive the same interpretation that was placed on the federal act, from which it was taken, by the Supreme Court of the United States." 147 N.W. at 1066. Other courts follow the same rule with regard to state antitrust laws.Shermanv. Mertz Enterprises, 42 Cal.App.3d, 769, 117 Cal.Rptr. 188 (1974);Pittsburgh Plate Glass Co. v. Paine Nixon Co., 182 Minn. 159,234 N.W. 453 (1931). Since anticompetitive practices like those authorized by the rule have been struck down under the Sherman Act, (see discussion and cases cited, supra), it appears that these same practices violate the state antitrust law.
Fair and vigorous competition is the foundation of our economic system and the antitrust laws have frequently been referred to as the "fundamental national economic policy." Gulf States Utilities v. FederalPower Commission, 411 U.S. 747, 759 (1973). This policy is no less vigorously adhered to in Colorado. As early as 1912, Colorado common law was held to prohibit a conspiracy to restrain competition among Denver dealers in food products.Denver Jobbers Ass'n v. People,21 Colo. App. 326, 122 P. 404 (1912). More recently, the Colorado Supreme Court made it clear that price-fixing measures for the benefit of a special group violate the fundamental policy of the state. Olin MathiesonCorp. v. Francis, 134 Colo. 160, 186, 301 P.2d 139 (1956). Several state laws incorporate this same policy.[5]
Moreover, the "state action" defense advanced in response to challenges under the federal antitrust laws poses a substantially different issue when raised in a challenge under state antitrust law. The Parker doctrine arose in the context of a deep concern by the federal courts for considerations of federalism. The approach enunciated in Parker was an attempt to strike a balance between federal antitrust policy and the police power of the states. There is no such conflict present when state antitrust laws are being applied. When a state regulatory scheme is scrutinized under the state antitrust laws, the court must simply attempt to harmonize two legislative enactments.
While there are no Colorado cases on point, the relationship between a regulatory scheme and the antitrust laws has been addressed by the United States Supreme Court on numerous occasions. The rule has developed that regulation replaces the antitrust laws only to the minimum extent required for the regulation to work. For example, in Silver v. New YorkStock Exchange, 373 U.S. 341 (1963), the Supreme Court was required to harmonize the regulatory scheme of the Securities and Exchange Act of 1934 with the federal antitrust laws. The Court held that although the Act provided an exemption for regulated stock exchanges, the exemption did not immunize a group boycott of a nonmember broker from the antitrust laws. The Court announced the principle that self-regulation of an industry is justified in response to antitrust charges "only to the extent necessary to protect the achievement and aims" of the regulatory statute.373 U.S. at 361. The Supreme Court reaffirmed this position inOtter Tail Power Co. v. United States, 410 U.S. 366 (1973), stating that "courts must be hesitant to conclude that Congress intended to override the fundamental national policies embodied in the antitrust laws."410 U.S. at 374.See also, Gulf States Utilities Co. v. Federal PowerCommission, 411 U.S. 747 (1973); Hughes Tool Co. v. T.W.A., 409 U.S. 363
(1973).
The Colorado legislature has expressed a similar concern over the "policies embodied in the antitrust laws." The question therefore is whether the "aims" of the legislature in providing for the licensing of architects requires the prohibition of competitive bidding. Nothing contained in the pertinent statutes suggests, either expressly or by implication, that the legislature sought to "override the fundamental (state) policies embodied in the antitrust laws." In the absence of evidence of any such intention, the issue must be resolved in favor of the state antitrust policy.
IV. THE PROPRIETY OF THE RULE UNDER COLORADO CONSTITUTIONAL LAW
The Colorado General Assembly created the Board to assure that architects in Colorado are properly licensed. C.R.S. 1973, 12-4-101(2). Pursuant to that responsibility, the Board has authority to:
 Adopt and from time to time revise such rules and regulations not inconsistent with the law as may be necessary to enable it to carry into effect the provisions of this article.
C.R.S. 1973, 12-4-104(3)(a).
It is clear under the foregoing provision that the Board has the power to make rules. That power is limited, however, by at least two factors. First of all, the very language of the statute authorizing the Board to make rules specifically limits its authority to rules "not inconsistent with the law." C.R.S. 1973, 12-4-104(3)(a). Since the rule is inconsistent with Federal and Colorado antitrust law, the Board does not have authority to make the rule.
In addition, under established principles of Colorado constitutional law, the Board may not make rules which exceed its rulemaking authority under the statute creating the Board. Thus, the identical issue raised by the Board's rule IV, l(b)(i) was addressed by the Colorado Court of Appeals in Lorance v. State Board of Examiners of Architects,35 Colo. App. 177, 532 P.2d 382 (1974). In Lorance the Board ordered plaintiff's license to practice architecture suspended for violating the following rule V(b)(II):
 If an architect has secured a contract on any work, it shall be deemed fraud or deceit in professional practice for any other architect to attempt to supplant him so long as his contract is in force.
The Board was acting, ostensibly, under C.R.S. 1963, 10-1-16(1)(e) (present C.R.S. 1973, 12-4-115(d)) which authorized it to discipline any licensee who
 Has been found guilty by the board or any court of record in this state of any fraud or deceit in his professional practice.
The architect filed a complaint against the Board in district court, which reversed the decision of the Board. The Court of Appeals affirmed, holding, at 35 Colo. App. 179-180, that the Board had exceeded its statutory rulemaking authority:
 An architect may be guilty of fraud or deceit in the manner in which he obtains a contract for a job in which another architect is already employed, but Rule V(b)(II) makes it an offense merely to supplant another architect, without requiring a showing of the elements of fraud or deceit as that concept is commonly understood at law. This the Board could not do. Unless expressly or impliedly authorized by statute an administrative board cannot change or modify existing statutes by the adoption of rules and regulations.
It seems equally clear that fraud and deceit, "as that concept is commonly understood at law", does not include competitive bidding. By ignoring the plain meaning of those terms the Board has attempted to exercise legislative power which it does not have.
The Colorado Supreme Court has frequently invalidated rules created by a state examining board when those rules were not within the scope of the board's authority under the statute creating the board. For example, inProuty v. Heron, 127 Colo. 168, 255 P.2d 755 (1953), the Colorado Supreme Court struck down a regulation of the State Board of Registration for Professional Engineers and Land Surveyors which classified engineers and limited them to certain types of practice, based upon the classification. Because the statute made no mention of classifications, the Supreme Court upheld a district court order enjoining enforcement of the Board rule, stating that the Board did not have the discretion to make distinctions which the statute did not make.
In Dixon v. Zick, 179 Colo. 278, 500 P.2d 130 (1972), optometrists challenged a regulation of the State Board of Optometric Examiners which stated that: "No optometrist shall conduct the practice of his profession in or on premises where a commercial or mercantile establishment is the primary business being conducted." The rule had been passed by the Board pursuant to rule-making authority similar to that which the Architects Board enjoys.See C.R.S. 1963, 102-1-7(2). The court held that the validity of a regulation issued by an administrative body in Colorado depends upon whether it is within the "scope and object" of the statutory delegation of authority which underlies the regulation.179 Colo. at 284. Because the court could not find in the optometry statute authorization for the type of rule the Optometric Board had passed, it struck down the rule as an improper attempt by the Board to make law.
It seems clear that the Board may not use its general rule-making power to define further, in advance, what constitutes "fraud and deceit" beyond what the legislature provides[6] or beyond what the common meaning of those terms connotes. Its authority to create rules "defining" fraud and deceit is limited by the legislature's delegation of authority to the Board. By attempting to include competitive bidding within the concept of fraud and deceit the Board has enlarged its powers beyond the confines of C.R.S. 1973, 12-4-104(3)(a). Indeed, the usual definition of fraud and deceit more likely warrants the conclusion that a refusal to submit price information is fraudulent and deceitful since fraud and deceit often involve elements such as failure to disclose, refusal to bring forth facts, or hiding the truth. Moreover, competitive bidding does not constitute a violation of any law and, as a result of the consent decree entered into by AIA, it does not violate any professional standard of conduct or code of ethics. It therefore seems clear that the Board does not have the authority under Colorado law to determine that competitive bidding constitutes fraud and deceit.
SUMMARY
For the foregoing reasons, it is concluded that the Board does not have the authority to promulgate or enforce rule IV, 1(b)(1) of its Rules and Regulations as presently written. Furthermore, continued promulgation and enforcement of the rule may subject the Board to suit for violation of both federal and Colorado antitrust law.

 Very truly yours,
 J.D. MacFARLANE
 Attorney General
ANTITRUST
ARCHITECTS AND ENGINEERS
RULES AND REGULATIONS
PURCHASING
15 U.S.C. § 1
C.R.S. 1973, 6-4-101 C.R.S. 1973, 12-4-101 C.R.S. 1973, 10-1-16(1)(e)
REGULATORY AGENCIES, DEPT. Architects Bd. of Exam
Rule passed by Board prohibiting architects from competitive bidding was outside the power of the Board to pass and was violative of federal and state antitrust laws. Further enforcement of rule would subject Board to antitrust suit.
[1] An exchange of letters between counsel for AIA and the Justice Department resulted in a modification of the consent decree, 1972 Trade Cas., § 74,074 (D.D.C. 1972). The modification provided that the decree did not affect conduct permitted by the Supreme Court decisions inEastern Railroad Presidents Conference v. Noerr Motor Freight, 365 U.S. 127
(1961); United Mine Workers v. Pennington, 381 U.S. 657 (1965);California Motor Transport Co. v. Trucking Unlimited, 402 U.S. 1008
(1972); and Parker v. Brown, 317 U.S. 341 (1943). This modification speaks only to whether such action constitutes a violation of the consent decree, but in no way addresses the legality of any state rule in existence at the time of the decree or adopted thereafter.
[2] Other similar practices frequently have been prohibited by consent decree. Elimination and suppression of bid and price competition in the mechanical contracting supply trade was enjoined in United States v.Clark Mechanical Contractors, 1973-2 Trade Cas., § 74,648 (W.D. Ky. 1973). In United States v. Richter Concrete Corp., 1972 Trade Cas., § 74,151 (S.D. Ohio 1972), ready-mix concrete suppliers were ordered to end suppression of price competition in the marketing of their product. Producers of anthracite coal were prohibited from entering into agreements to refrain from competing in the bidding, sale, and distribution of coal under an Army program in United States v. AnthraciteExport Ass'n, 1972 Trade Cas., § 73,348 (M.D. Pa. 1972). Plumbing contractors were enjoined from compelling or coercing other contractors to refrain from soliciting or negotiating for plumbing contracts on a competitive basis in United States v. Cuddigan, 1970 Trade Cas., § 73,175 (D.R. I. 1970).
[3] In light of Goldfarb, a 1975 district court decision holding that the practice of architecture is exempt from antitrust scrutiny under the "learned profession" doctrine appears to be clearly improper.Bank Bldg. Equipment Co. v. Nat'l Council of Architectural Registration Boards, 1975 Trade Cas. § 60,108 (D.D.C. 1975). Bank Bldg. was decided before theGoldfarb decision and did not cite a single case in support of the proposition that the "learned profession" doctrine was applicable.
[4] Numerous cases decided before Goldfarb restricted the applicability of the Parker doctrine. One line of cases represents what has been called the "final decision" limitation on the state action exemption. This rule requires that appropriate state officials, acting under the regulatory scheme, make the decision which affects competition adversely. For example, in Asheville Board of Trade v. F. T.C., 263 F.2d 502
(4th Cir. 1959), the court ruled the state action exemption does not apply under a program regulating tobacco sales where competitors themselves, and not state officials, promulgate rules regarding the sale of a commodity.
Another limitation on Parker is the statutory purpose rule. Thus, inTravelers Insurance Co. v. Blue Cross, 298 F. Supp. 1109 (W.D. Pa. 1969), the court held that approval and direction of the action of a private entity by a state regulatory agency does not exempt that entity from the antitrust laws, unless the state endows it with a governmental character and "directs and authorizes that entity . . . to utilize anticompetitive means to achieve a specific governmental purpose."298 F. Supp. at 1111.
Finally, a finding of "palpable misfeasance" by a government agency will take governmental regulatory action out of the Parker rule. For example, in Woods Exploration and Producing Co. v. Alcoa, 438 F.2d 1286 (5th Cir. 1971), cert. denied, 404 U.S. 1047 (1972), the defendants submitted false and misleading forecasts regarding the amount of natural gas they expected to market. Acting on this data, a state regulatory agency reduced the amount of natural gas removal to the detriment of a small-tract producer. The court rejected the "facile conclusion" that action by any public official automatically confers antitrust immunity and held that the action of the state agency in accepting the false filing was not exempt from the antitrust laws.
[5] See, e.g.., C.R.S. 1973, 24-30-404, which requires competitive bidding for contracts made by the state purchasing agent; and C.R.S. 1973, 10-4-404, which constitutes a thorough antitrust statute governing the insurance industry. Moreover, the Colorado legislature was among the first states to repeal its fair trade law (formerly C.R.S. 1973, 6-3-102et seq).
[6] In subsequent sections of the same act, the legislature does provide some substance for the concept. The Board may discipline a licensee for "fraud and deceit in procuring, or attempting to procure (a) license." C.R.S. 1973, 12-4-115(a); it is a misdemeanor to "fraudulently obtain or furnish any architect's license," C.R.S. 1973, 12-4-118(a), or to use any designation to imply that one is an architect without having a license, C.R.S. 1973, 12-4-118(c).