# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-2141

_____

| | | |
|---|---|---|
| Porous Media Corporation, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Midland Brake, Inc., a Delaware | * | |
| Corporation, | * | |
| | * | |
| Defendant-Appellant. | * | |

_____

Submitted:  March 15, 2000

Filed:  July 20, 2000

_____

Before RICHARD S. ARNOLD, LAY, and BEAM, Circuit Judges.

_____

LAY, Circuit Judge.

Midland Brake, Inc. ("Midland") appeals a jury verdict awarding $4,830,105 in damages to Porous Media Corporation ("Porous") for breach of contract.[1]  We affirm the breach of contract verdict and reverse in part the award of damages.

_____

[1]Midland counterclaimed for damages for Porous' alleged breach of warranty. The jury denied recovery.  No appeal was taken.

## I. Background

Porous manufactures filters and filter products. Before being purchased by another company in 1998, Midland manufactured air-brake systems used by large trucks. In 1991, Midland wanted Porous to help develop a new air dryer for its brake system – the Pure Air Plus ("PAP") system. Midland and Porous agreed that Porous would design and manufacture two specialty components for Midland's PAP system: a canister and a coalescer. In 1992, without a written agreement with Midland, Porous began manufacturing the specialty components.

In late 1993 and early 1994, problems developed with the PAP system. To resolve these problems, Porous and Midland entered into a written agreement (the "Agreement"). This Agreement included two relevant clauses: (1) Midland could inspect Porous' manufacturing plant once it signed a confidentiality agreement promising not to "cause others to manufacture" Porous' product,[2] and (2) Porous would design and manufacture new canisters and coalescers for the PAP system as long as Midland agreed not to "resource" (i.e., find another supplier for) Porous' product unless Porous delivered low-quality items or was late on a shipment.[3] Porous drafted

---

[2]This term was codified in ¶ 6 of the Agreement, which states: "MIDLAND agrees to not compete with POROUS MEDIA and will not manufacture, attempt to manufacture or cause others to manufacture SPIN-ON DESICCANT CANISTERS or COALESCERS for duration of Agreement, or 5 years, which ever is longer." Porous demanded this clause to protect its investment in the canisters and coalescers.

[3]This term was codified in ¶ 7 of the Agreement, which states in part:

MIDLAND reserves the right to resource SPIN-ON DESICCANT CANISTERS or COALESCERS that do not use POROUS MEDIA proprietary design if POROUS MEDIA fails to produce SPIN-ON DESICCANT CANISTERS or COALESCERS to originally or mutually agreed upon quality levels or in the event that POROUS MEDIA is

-2-

the original Agreement, which was altered during negotiations. Under ¶ 5 of the Agreement any "assignee, transferee, successor or receiver" of Midland was bound by the Agreement.

From February 1994 to April 1997, Midland accepted thousands of Porous' products.[4] Shortly after signing the Agreement, however, Midland contacted Baldwin Filter Company ("Baldwin") to discuss supplying canisters and coalescers. Midland then provided Baldwin with the specifications for the canisters and coalescers. Porous and Midland disagree about the scope of the information Midland shared with Baldwin. Porous argues that Midland negotiated with Baldwin to make canisters and coalescers using Porous technology; Midland admits that Baldwin made and supplied it with canisters and coalescers, but argues that Baldwin did not use Porous technology, and that Baldwin already made a similar product.

Sometime subsequent to the 1994 Agreement, Baldwin began developing prototype canisters and coalescers for Midland. After several years of development, in the spring of 1997, Baldwin qualified as a supplier for Midland. Shortly thereafter, Midland stopped purchasing coalescers and canisters from Porous, and started buying them exclusively from Baldwin.

In 1998 Haldex Brake Products Corporation ("Haldex") purchased Midland's facilities, including facilities producing the PAP system. Haldex continued producing Midland's PAP system, and continued to purchase canisters and coalescers from

---

unable to deliver specified SPIN-ON DESICCANT CANISTERS or COALESCERS within eight weeks after receipt of order or two weeks after an order is due for three consecutive orders of that part.

[4]The parties disagree over the quality of Porous' products. Both parties agree, however, that between 1994 and 1997, Midland took no steps to repudiate the Agreement because of low-quality products.

Baldwin. Haldex employed the same people to work on the PAP system, maintained the same manufacturing plant, and maintained most of Midland's customers and suppliers.

In April 1997, Porous commenced this action in the United States District Court for the District of Minnesota, alleging Midland breached two sections of the Agreement, specifically: (1) breach of ¶ 7 by failing to purchase canisters and coalescers from Porous, and (2) breach of ¶ 6 by causing another party to manufacture canisters and coalescers before the expiration of the Agreement.[5] A jury trial was held in October 1998. The jury returned a verdict in favor of Porous, awarding damages for lost profits not only for the five-year contract period, but for three years beyond the terms of the contract.[6] Midland's motion for a new trial was denied, and Midland appealed to this court.

---

[5]Porous has since filed a separate action in the federal district court alleging Midland stole Porous' trade secrets and infringed on its patents. After Porous learned of Midland's dealings with Baldwin, Porous tried to amend its Complaint alleging, in addition to the breach of contract claims, that Midland violated the Minnesota Trade Secrets Act. See Minn. Stat. § 325C.01 et seq. The district court rejected Porous' motion because it was filed after the deadline established for motions to amend.

[6]The jury apparently reached this damage level by combining (1) the lost profits caused by Midland's breach of ¶ 7 (the requirements clause) *and* (2) the profits Porous would have made by supplying Midland with the canisters and coalescers for three years after the contract ended. The three year figure was the time it took Baldwin to produce adequate canisters and coalescers. The theory is that if Midland had not breached ¶ 6 by causing Baldwin to make canisters and coalescers, Midland would need three years from the expiration of the Agreement to find an adequate supplier. During this time, Midland would have had no choice but to continue to purchase canisters and coalescers from Porous.

Midland raises three arguments on appeal. First, Midland argues that the district court failed to interpret ¶ 7 as a matter of law, and that the court issued faulty jury instructions regarding this paragraph. Second, Midland argues that the district court failed to hold that the covenant not to compete (¶ 6) violated Minnesota law.[7] Finally, Midland believes that the damages awarded were excessive as a matter of law. We affirm the jury's verdict for breach of contract, and reverse in part on the issue of damages.

## II. Discussion

A.  *The District Court Gave Proper Jury Instructions Regarding the Interpretation of the Requirement Contract*

Midland argues that the district court provided the jury with faulty instructions. Midland argues three points: 1) the trial court erroneously allowed the jury to interpret ¶ 7 as a requirement contract, 2) it was entitled to a *contra proferentem* instruction, and 3) the trial court provided inadequate instructions on the burden of proof. When reviewing the trial court's jury instructions, we look at the instructions as a whole. See May v. Arkansas Forestry Comm'n, 993 F.2d 632, 637 (8th Cir. 1993). The trial court has broad discretion in formulating the language of jury instructions and will not be overturned on appeal so long as the instructions given are accurate and fair to both parties. See Federal Enterprises, Inc. v. Greyhound Leasing & Financial Co., 849 F.2d 1059, 1061 (8th Cir. 1988). Examining the instructions given in this case, we find no reversible error.

---

[7]Due to our disposition of the damages issue, we need not address this claim. See infra note 9.

## 1. Requirement Contract

Midland first argues that the district court should not have allowed the jury to construe ¶ 7 as a requirement contract. Paragraph 7 reads, in part, "MIDLAND reserves the right to resource SPIN-ON DESICCANT CANISTERS or COALESCERS that do not use POROUS MEDIA proprietary design if POROUS MEDIA fails to produce [products] to original or mutually agreed upon quality levels [or if Porous is late for delivery]." The trial court instructed the jury as follows:

> [T]he written terms of the agreement do not expressly require Midland to buy all its canisters or filters from Porous, although the limited reservation of Midland's rights to resource contained in paragraph 7 may imply that meaning. You may or may not find that the parties, by their statements and actions, manifested their understanding that the agreement required Midland to buy all of its needs for those products from Porous, and no one else, for the term of the agreement.

Trial R. at 1711. The jury found that ¶ 7 was a requirement contract that Midland breached by purchasing canisters and coalescers from Baldwin.

To interpret the terms of a contract under Minnesota law, a court must initially determine whether a contract term is ambiguous. See Green Tree Acceptance, Inc., v. Wheeler, 832 F.2d 116, 117 (8th Cir. 1987) (applying Minnesota law); In re Turner Crossroads Dev. Co., 277 N.W.2d 364, 369 (Minn. 1979). A contract term is ambiguous if it is reasonably susceptible to more than one interpretation. See Green Tree, 832 F.2d at 117. The meaning of an unambiguous contract is a matter of law for the court, see id., however, the meaning of an ambiguous contract term is a fact question for the jury. See id. A trial court's determination of whether a contract term is ambiguous is a matter of law we review de novo. See id. at 118. Given our standard of review, we need only ask whether ¶ 7 could be reasonably interpreted as a

requirement contract; if so, then the contract term must have been either ambiguous or unambiguous in plaintiff's favor.

A requirement contract is defined "as a contract in which the seller promises to supply all the specific goods or services which the buyer may need during a certain period at an agreed price in exchange for the promise of the buyer to obtain his required goods or services exclusively from the seller." Upsher-Smith Lab., Inc. v. Mylan Lab., Inc., 944 F. Supp 1411, 1426 (D. Minn 1996). Under Minnesota law, we must accept the trial court's characterization of ¶ 7 as ambiguous, and the jury's factual finding that it was a requirement contract, if it could reasonably be interpreted as requiring Midland to purchase all the canisters and coalescers it needed from Porous. Under the Uniform Commercial Code ("U.C.C."), which Minnesota has adopted, no special language is necessary to create a requirement contract. See Koch Hydrocarbon v. MDU Resources, Inc., 988 F.2d 1529, 1541 (8th Cir. 1993). This court has upheld a jury's determination that an ambiguous clause was a requirement contract where the course of dealing between the parties made it clear that the relationship was intended to be exclusive. See Universal Power Systems, Inc. v. Godfather's Pizza, Inc., 818 F.2d 667, 670-671 (8th Cir. 1987) (construing Missouri U.C.C. clause identical to Minnesota U.C.C. clause).

We believe that a reasonable jury could have found that ¶ 7 was a requirement contract. Paragraph 7 gave Midland the right to "resource" *only* if Porous supplied low-quality items or if Porous was late for a delivery or series of deliveries. The likely and reasonable interpretation of this clause is that, absent one of the specified failures by Porous, Midland was required to purchase all the canisters and coalescers it needed from Porous. We find that the trial court correctly found ¶ 7 ambiguous, and that its jury instructions properly informed the jury of the applicable law.

## 2. *Contra Proferentem*

Midland next argues that because Porous provided the form for the contract, the district court should have given a *contra proferentem* instruction.[8]  We disagree.  In Terra Int'l Inc. v. Mississippi Chemical Corp., 119 F.3d 688, 692 (8th Cir. 1997), this court refused to give a *contra proferentem* instruction even where one party supplied the form "due to the relatively equal bargaining strengths of both parties and the fact that [the appellant] was represented by sophisticated legal counsel during the [contract formation]."  Although Porous did provide the contract form, Midland's lawyer reviewed the form and Midland suggested changes that were ultimately incorporated into the Agreement.  This, plus the equal bargaining power of the parties, made a *contra proferentem* instruction inappropriate.  Thus, we hold that Midland was not entitled to a *contra proferentem* instruction.

## 3. *Burden of Proof*

Finally, Midland argues that the trial court's jury instructions on the burden of proof were inadequate.  Porous had the burden of proof on all of its contract claims.  Although the trial court did not provide a specific burden of proof instruction with each separate instruction, it did inform the jury that "[t]he plaintiff, Porous Media, bears the burden of proof on its breach of contract claims . . . ."  Trial R. at 1707.  We note that in a similar case, the Third Circuit has upheld jury instructions, despite the absence of a specific burden of proof instruction on each claim, where the court gave a general instruction assigning to plaintiff the burden of proof.  See Tigg Corp. v. Dow Corning Corp., 962 F.2d 1119, 1123 (3rd Cir. 1992).  In light of the trial court's general burden

---

[8]A *contra proferentem* instruction is appropriate where one party drafts and controls the contractual terms of a contract; in such situation, a *contra proferentem* instruction tells the jury to construe any ambiguity in such contract against the drafter. See Current Technology Concepts v. Irie Enterprises, Inc., 530 N.W.2d 539, 543 (Minn. 1995).

of proof instruction, and our limited standard of review, we hold that the trial court adequately informed the jury of the law regarding Porous' burden of proof on its claims.

## B.  Damages

The jury awarded Porous lost profit damages for the length of the Agreement and for a three-year period after the end of the Agreement.  Midland argues that the trial court should have cut off damages at one of two points: (1) at the end of the five-year requirement contract, or (2) at the point when Haldex purchased Midland's PAP system and facilities.  We review damage awards under a two prong test.  See Hicks v. Capitol American Life Ins., 943 F.2d 891, 893 (8th Cir. 1991).  First, we review whether a particular class of damages was properly before a jury on a de novo basis.  See id. (holding first step in reviewing consequential damage award is whether "such [consequential] damages are even properly before the jury as a matter of law.")  Once we determine that an issue was properly before the jury, we apply the familiar principal that an appellate court "may not substitute its view of the facts for that of the trier of fact unless it is in a position to hold that reasonable minds, viewing the evidence in the light most favorable to the prevailing party, could only have found otherwise than the trier of fact."  Id. (quotation omitted).  We examine each of Midland's points in turn.

### 1.  Damages for the Three-Year Post-Agreement Period

The jury awarded Porous the profits it would have made had it continued to sell canisters and coalescers for the three-year period after the end of the Agreement. While the trial court did not provide a special verdict form, such award appears to be based on the fact Baldwin took three years to produce satisfactory components.  Thus, Porous argues, had Midland been faithful to the non-compete clause, it would have had to purchase components from Porous for a period of time after the Agreement.  In

response, Midland argues that the damages awarded for the three-year period following the Agreement are too speculative as a matter of law.[9]  We agree with Midland.

The post-agreement damages are consequential damages.  See Dan Dobbs, Law of Remedies 2d 41 (1993) (defining consequential damages as those damages "not based on the capital or present value of the promised performance but upon benefits it can produce or losses that may be caused by its absence.")  Under Minnesota law, consequential damages suffered due to a breach, can be recovered so long as the party breaching the contract had reason to know of the potential losses.  See Minn. Stat. § 332.2-715(2).  In order to recover consequential damages in the form of lost profits under Minnesota law, a plaintiff must prove with reasonable certainty that it is entitled to such damages.  See Industrial Graphics, Inc. v. Asahi Corp., 485 F. Supp 793, 804-5 (D. Minn 1980) (construing Minnesota U.C.C. and case law).  See also Dan Dobbs, Remedies 85 (1993) (arguing that the contemplation of the parties test assumes "that the boundaries of contract liability are determined by the contract itself; the scope of the risks assumed by the defendant delineate the scope of his liability.")  Thus, under Minnesota law, and our standard of review, our inquiry is whether post-contractual damages were properly before the jury.  This question turns on whether the parties contemplated allowing Porous' consequential damages for lost profits after the end of the requirement Agreement.

---

[9]Due to our disposition of this issue, we have no need to decide Midland's argument that the non-compete clause was an illegal restraint of trade.  The non-compete clause only allowed Porous consequential damages incurred after the contractual period.  If Midland was barred from talking to another supplier during the five-year contractual period, then it is arguably foreseeable that Midland would have to rely on Porous' products for some time after the five-year contractual period.  As we find that the post-contractual damages were inappropriate for other reasons, we need not decide the legality of the non-compete clause.

We do not believe that such damages were properly before the jury. The basis of the post-contractual damages was the non-compete clause. Except for Midland's breach, Haldex (or Midland) would have had no choice but to purchase canisters and coalescers from Porous. The trial court found, and we agree, that the non-compete clause served as prophylactic protection against the theft of trade secrets. See Mem. and Order, 3 (Feb. 11, 1999). This being so, this clause could not have contemplated allowing Porous post-contractual damages; it only provided further protection against trade secret theft. Further evidence is found in the five-year requirement period. The explicit limitation on the time Midland was required to purchase canisters and coalescers from Porous suggests that post-contractual consequential damages were not contemplated. Under this agreement, Porous agreed to assume the risk of investing in and designing the new components, while Midland agreed to assume the risk of buying all the components it needed in good faith from Porous *for the five year period* – no more.

We thus hold that the parties did not contemplate allowing Porous damages for post-contractual lost profits. As such, we find the portion of damages awarded for post-contractual sales to be erroneous and we order a reduction of the amount involved in the post-contractual sales.

### 2. *Damages After Midland's Sale of the PAP Facilities to Haldex*

Midland argues that even if ¶ 7 is a valid requirement contract, Porous' damages extend only for the period of time Midland had requirements. Midland urges that after Haldex purchased the PAP system, Midland no longer needed Porous' canisters and coalescers; thus, even assuming a breach of contract, Midland asks us to limit damages to the time preceding Haldex's purchase of the PAP system.

In rejecting a motion for a new trial, the trial court held that such damages were proper "since the Agreement itself provided that it would bind any 'assignee,

-11-

transferee, successor or receiver of Midland'" and because "Haldex wrote to all of Midland's suppliers assuring them that existing relationships would continue." Mem. and Order, 5 (Feb. 11, 1999).

The parties do not dispute that after Midland's sale of the PAP system to Haldex, Midland no longer had any need for Porous' canisters and coalescers. Porous urges, however, that Minnesota law reads into requirement contracts an implicit "mutual understanding that the [defendant's business will] continue." Pittsburgh Plate Glass Co., v. Daine and Personnel & Nixon Co., 234 N.W.2d 453, 457 (Minn. 1930). See also Western Oil & Fuel Co. v. Kemp, 245 F.2d 633, 638 (8th Cir. 1957) (applying the rule of Pittsburgh Plate Glass to a Minnesota case). The Pittsburgh Plate Glass court rejected the notion that requirement contracts are void for lack of mutuality of obligation; the implied promise to stay in business provides the necessary mutuality. See Pittsburgh Plate Glass, 234 N.W.2d at 457.

Midland argues that Pittsburgh Plate Glass is no longer controlling. Subsequent to Pittsburgh Plate Glass, Minnesota adopted U.C.C. § 2-306. Section 2-306 states that buyers in a requirement contract are bound to determine their requirements in "good faith." Minn. Stat. § 336.2-306(1). The comments to this section make it clear that in some situations, a business can have no requirements in good faith: a shut down "for lack of orders" might be permissible, while a shut down "merely to curtail losses would not." Id. at com. 2. Other courts that have construed the good faith requirement in this context have defined good faith as "a good commercial reason – independent of the terms of the contract – for discontinuing [the requirement contract] . . . ." E.g., AGFA - Gevaert, A.G. v. A.B. Dick Co., 879 F.2d 1518, 1522 (5th Cir. 1989). Midland relies on the adoption of the U.C.C. to argue that Pittsburgh Plate Glass has been overruled, and believes that its sale of the PAP system to Haldex was in good faith as defined by U.C.C. § 2-306.

Midland's argument fundamentally misses the point. Even if we assume that Pittsburgh Plate Glass was overruled by the adoption of the U.C.C., and that Midland's sale of the PAP system was in good faith (so as to cut-off Midland's requirements), Porous still suffered *consequential* damages as a result of Midland's breach. As discussed *supra*, consequential damages are those damages that flow naturally and foreseeably from the breach and are within the contemplation of the parties at the time of contracting. Upon purchasing the PAP system, Haldex kept most of Midland's suppliers – including Baldwin; thus, except for Midland's breach, Haldex would have continued to purchase canisters and coalescers from Porous. Furthermore, such damages were within the contemplation of the parties at the time of contracting: ¶ 5 made the agreement "binding upon any division, subsidiary, assignee, transferee, successor or receiver of Midland." Thus, we hold that a reasonable jury could have found that Porous was entitled to these damages.

Midland suggest that Porous sued the wrong party. Midland believes that Haldex now has the contractual obligation to Porous by reason of the sale. We reject this argument. In the spring of 1997, Midland informed Porous that it would no longer purchase canisters and coalescers from Porous. Midland then sold its facilities to Haldex in March of 1998. At the point of Midland's sale of the PAP facilities, Midland had already committed its breach and Porous had already filed this suit; thus, Midland could no longer demand that Porous fulfill the contract. See Minn. Stat. § 336.2-703 (allowing a non-breaching seller to cancel the contract upon wrongful termination of the contract by the buyer). Even if Haldex would have been bound by an existing contract between Porous and Midland, it could not have been bound by a contract that no longer existed due to Midland's breach.

For these reasons, we affirm the jury's award of damages for the period between Haldex's purchase of the PAP system and facilities and the end of the agreement.

-13-

### 3. Calculating the Remaining Damages

The total damage award was $4,830,105.  This amount consisted of $799,169 in damages to Porous from the point of breach up until the sale of Midland to Haldex, and $828,697 in damages for the period after Haldex purchased Midland to the end of the requirements contract period.  The verdict erroneously included $3,202,239 in damages for post-contractual sales arising from the alleged consequential damage after the contract had expired.  For the reasons discussed, we vacate the $3,202,239 in damages for the post-contractual sales, thus leaving a proper award of damages in the amount of $1,627,866.

## III. Conclusion

We affirm the judgment against Midland as reduced to $1,627,866 for breach of the requirements contract.

AFFIRMED IN PART, REVERSED IN PART.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-14-