53 F.3d 899
 CHICAGO TITLE INSURANCE COMPANY, a Missouri Corporation,
Plaintiff-Appellee,
v.
RESOLUTION TRUST CORPORATION, as Receiver for Murray Federal
Savings and Loan Association, a Federal Mutual
Savings and Loan Association, Defendant-Appellant,
v.
McCOMBS, FRANK, ROOS ASSOCIATES, formerly known as McCombs,
Knutson Associates, Inc., a Minnesota Corporation,
Third Party Defendant.
 No. 94-2845.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 16, 1995.
Decided April 25, 1995.
Rehearing and Suggestion for Rehearing
En Banc Denied July 13, 1995.
 
 Jerome Alan Miranowski, Minneapolis, MN, argued (Mark P. Wine and Craig A. Cook, on brief), for appellant.
 R. Dickey Hamilton, Chicago, IL, argued (Louis W. Brenner, Sr. and Michael J. Orme, on brief), for appellee.
 Before BOWMAN, BEAM, and MURPHY, Circuit Judges.
 DIANA E. MURPHY, Circuit Judge.
 
 
 1
 This case is about the right to recover under a title insurance policy insuring a mortgagor against loss of priority resulting from mechanic's liens. Chicago Title Insurance Company (CTI) brought this declaratory action against the Resolution Trust Corporation (RTC) in its capacity as receiver for Murray Federal Savings and Loan (Murray), an insolvent financial institution, to determine the parties' rights and liabilities under a title insurance policy and endorsement issued to Murray.[1] The position of the RTC is that it is entitled to recover under the policy, but CTI believes that exclusions in the policy and limitations in the endorsement control. The RTC appeals from a judgment in the district court in favor of CTI. For the reasons discussed below, we reverse and remand.
 
 I.
 
 2
 Murray became involved in the construction of the Tealwood Apartments complex in Bloomington, Minnesota when it agreed to lend the project developer, Tealwood Associates, $11,900,000. Murray and Tealwood Associates entered into a "Construction Loan Agreement" on July 23, 1987. The loan was secured by a mortgage on the property, and Tealwood Associates agreed to purchase for Murray a title insurance policy to protect the priority of the mortgage. The loan closing and filing of the mortgage occurred on August 12, 1987, and the policy was issued August 13, 1987. The policy insured Murray against "loss or damage" caused by any liens which arose prior to August 13.
 
 
 3
 The policy contained several exclusionary clauses, two of which have been raised here. Clause 3(a) excluded from coverage "[d]efects, liens, encumbrances, adverse claims, or other matters created, suffered, assumed or agreed to" by Murray. Clause 3(b) excluded "[d]efects, liens, encumbrances, adverse claims, or other matters ... not known to [CTI] and not shown by the public records" if Murray knew of them and failed to disclose them to CTI in writing.
 
 
 4
 Since the standard title insurance policy offered by CTI did not cover mechanic's liens arising after the date the policy was issued, Murray sought an endorsement providing coverage for loss or damage caused by loss of mortgage priority due to liens arising after the August 13 policy date. The endorsement was issued on November 5, 1987. It covered subsequent liens but not "loss or damage by reason of any failure by the insured to comply with or to enforce any of the provisions of the Construction Loan Escrow and Disbursing Agreement ... which relate to the disbursement of the proceeds of the loan secured by the insured mortgage."
 
 
 5
 The "Construction Loan Escrow and Disbursing Agreement" (the disbursement agreement) was entered into August 25, 1987. The parties to it were CTI, Tealwood, general contractor Woodsage Construction Company, and Murray. CTI wanted such an agreement before issuing the endorsement. It was to control monthly advances on the loan from Murray to the developer. CTI was to hold funds from the lender in escrow and to disburse them at Murray's direction. The developer warranted that as of the date of the agreement there were sufficient funds to complete the project. Disbursement Agreement Sec. 7.08. The agreement also stated that CTI was not obligated to act except as required under the agreement and that it assumed no liability that the project would "be completed as contemplated, or that sufficient funds [would] be available for completion." Disbursement agreement Secs. 6.02 & 6.03. Murray negotiated additional language which clarified that the disbursement agreement did not "limit the coverage provided by the title policy." Disbursement agreement Sec. 7.04. Exhibit III to the agreement required that CTI be provided with sufficient funds to cover disbursements approved by the lender and the developer.[2]
 
 
 6
 CTI also took steps to protect itself before issuing the title insurance policy. Under Minnesota law, any mechanic's lien claims arising during construction will have priority over a mortgage if visible improvements were made to the property before the mortgage is recorded. Minn.Stat. Sec. 514.05. CTI required that Tealwood Associates and its general partner, Joseph Liebold, hire an independent engineer to inspect the property on August 12, 1987, the morning of the loan closing, and to verify that there were no visible improvements to the site.[3] CTI required the independent engineering report because concerns had arisen about the possibility that such improvements had been made. CTI attorney Marylu Dorwart, who lived near the Tealwood site, testified at trial that she had seen equipment on the property several years before construction of the apartment complex. In 1987 she noticed that road work was occurring.[4] During the summer of 1987, prior to the issuance of the policy, Dorwart and counsel for Murray discussed the possibility that improvements might have occurred.
 
 
 7
 The engineer who was hired to inspect the property, Dale Hamilton of third party defendant McCombs, Frank, Roos Associates, took photographs and submitted his conclusions in an affidavit, which CTI received and initialed before it issued the policy after the loan closing and the filing of the mortgage. The engineer's affidavit stated that no materials had been delivered to the site, and no excavation, grading or other site preparation had occurred. It also reported that there were no engineering or surveyor stakes, and that there had been "no visible beginning of any improvement thereon, except as follows: Boundary Monumentation." The monumentation was in the form of large mounds of dirt piled on or near the site. Testimony at trial indicated that the dirt had been placed at the site between April and June of 1987 by a road construction crew.
 
 
 8
 Construction on the apartment complex began in August 1987. Within several months the project began to experience cost overruns.[5] Murray reacted to address the overruns, including asking Tealwood Associates and Liebold to put up additional funds for the project. They did not do so, but they agreed to use funds budgeted for their fees to pay subcontractors. They also attempted unsuccessfully to find a buyer who could complete the project. Murray also gave up interest payments and rearranged the project budget. It distributed to the developer funds earmarked for future work in order to pay for already completed work. In rearranging the budget, Murray did not set aside loan proceeds to pay for retainage. The construction loan agreement which had been entered into by Murray and Tealwood Associates in July 1987, before the loan closing, provided that 10 percent retainage could be withheld pending satisfactory completion of work and that Murray would advance retainage to the developer for completed work as part of the regular loan disbursal process. Murray had a right under that agreement to halt construction if delays caused the project to enter default, but it did not exercise it. At the time Murray estimated that halting and restarting construction would add approximately $200,000 to the total project cost, and so it continued to advance loan money while the developer searched for additional funds.[6]
 
 
 9
 In May 1989, Tealwood Associates abandoned the unfinished project, and Murray was declared insolvent. All but $435,000 of the loan funds had been used by this point. The Federal Savings and Loan Insurance Corporation, the RTC's predecessor, brought an action on Murray's behalf in state court for appointment of a receiver to complete construction. A real estate development company was appointed receiver, and the state court authorized Murray to advance the receiver funds to complete the project. Murray supplied the receiver approximately $670,000, which included the $435,000 of committed loan funds which had not yet been spent, as well as additional funds beyond those contemplated in the original construction loan.
 
 
 10
 Twenty one mechanic's lien claims totaling $954,000 were filed against the property after the developer abandoned the project. The lien claimants brought several state court actions in which Tealwood Associates, its general contractor, and the RTC were defendants. The cases were removed to federal court and consolidated. O & P Constr. Co. v. Tealwood Assocs. Ltd., et al, Civ.No. 4-89-578 (D.Minn.); Lyman Lumber Co. v. Woodsage Constr. Co., et al and 98 Normandale Ltd. Partnership v. Lyman Lumber Co., et al, Civ.No. 4-90-62 (D.Minn).
 
 
 11
 CTI decided to settle with one of the lien claimants, and in August 1991 it paid $77,000 to Lyman Lumber Company in settlement of Lyman's claim for $125,000. The RTC claims CTI was motivated to settle with Lyman because its lien claim could affect adjoining property on which CTI had issued a policy.
 
 
 12
 The remainder of the lien claims went to trial in October 1991. The claimants' theory at trial was that the mounds of dirt documented by the engineer the day of closing were visible improvements which gave all subsequently filed mechanic's liens priority over Murray's mortgage. The RTC and CTI jointly agreed to settle the claims after several days of testimony.
 
 
 13
 The record does not contain a written settlement agreement, but there is a letter from counsel for the RTC to counsel for CTI stating the terms; CTI has not contested its accuracy. CTI and the RTC each paid $249,000 in settlement of the claims which went to trial. The letter did not refer to CTI's prior settlement of the Lyman Lumber Company lien claim. CTI and the RTC reserved all claims against each other, including claims for reimbursement of the $249,000 paid by each. CTI subsequently brought this declaratory judgment action[7] seeking to recover from the RTC under the terms of the settlement agreement the amounts CTI had paid in the joint settlement and in its separate settlement with Lyman.
 
 
 14
 A jury trial in this case was held in March 1994, at which CTI took the position that it had no duty to indemnify the RTC or to defend it in the actions brought by the lien claimants because policy exclusions 3(a) and 3(b) and the endorsement precluded coverage. The RTC presented its theory that CTI had both the duty to defend and to indemnify based on the policy and the endorsement. At the close of evidence both parties moved for judgment as a matter of law. The district court granted CTI's motion without specifically referring to the RTC's oral request.
 
 
 15
 In granting CTI's motion the court stated that the evidence relating to exclusion 3(b) was "problematic," referring to the very large amount of dirt deposited at the property and to the preclosing site inspection, and based its ruling on exclusion 3(a). It held that Murray "by its inattention, by its direct decisions, and by its indirect decisions created ... and caused the losses ... and agreed to do so." Tr. of oral order of March 28, 1994 at 2-3. The court noted that Murray had continued to pay out loan funds despite warnings from CTI, and concluded that the decision to fund cost overruns was "not an insured risk covered under this policy" but a "calculated ... business decision." Id. at 6.
 
 
 16
 The court thereafter submitted the case to the jury. The verdict form called for answers to two questions: whether "the mechanic's liens were excluded from coverage under the title insurance policy" and whether CTI was obligated to provide a defense to the RTC on the lien claims. The jury answered "yes" to both questions.[8] The verdict form did not distinguish between the two exclusionary clauses, and it is therefore unclear whether the jury relied on clause 3(a), clause 3(b), or both as the basis for its "yes" answer.[9] Judgment was subsequently entered in favor of CTI for $326,000, an amount which included CTI's portion of the joint settlement as well as the money it paid in its individual settlement with Lyman Lumber.
 
 
 17
 The jury instructions were relatively brief. Exclusion 3(b) and the policy endorsement were simply mentioned without elaboration. Somewhat more attention was given to exclusion 3(a). The entire instruction with respect to the policy, its exclusions, and the endorsement was as follows:
 
 
 18
 The burden is on the plaintiff in a civil case such as this to prove every essential element of its claim by ... a preponderance of the evidence.
 
 
 19
 ....
 
 
 20
 [Y]ou are to consider the entire policy, and fairly construe its meanings. The words of the jacket, the printed pages, and all of the exceptions, conditions, and exclusions are part of that contract.
 
 
 21
 Now, I've been telling you about law. Now I'm going to speak to you for a moment and just focus with you on the claims.... The [RTC] claims that the title insurance policy provided coverage of the underlying mechanic's lien claims.... [CTI], on the other hand, for its side, claims that the policy did not provide coverage of the mechanic's lien claims. It is the position of [CTI] that those claims are excluded from coverage under the insurance policies specifically under exclusions 3(a) and 3(b). [CTI] also claims that certain of the mechanic's lien claims are excluded by the endorsement to the policy dated November 5, 1987....
 
 
 22
 ....
 
 
 23
 [Y]ou may find that one or more of the mechanic's liens asserted against the Tealwood property is excluded from the coverage of [the] title insurance policy under 3(a) if you find that the mechanic's lien resulted from intentional misconduct or inequitable dealings by Murray Savings. Or that Murray Savings either expressly or impliedly assumed or agreed to the liens in the course of funding the Tealwood property mortgage.
 
 
 24
 Tr. vol. IX at 106-08.
 
 
 25
 The RTC argues that the district court committed several errors. It says the court erred in granting CTI's motion for judgment on exclusion 3(a) because, as a matter of law, Murray did not cause, suffer, assume or agree to the liens. The jury should not have been asked whether the liens were excluded from coverage because neither exclusion applied. Clause 3(b) by its terms does not cover site conditions, it argues. Further, since CTI had actual knowledge of the existence of the dirt mounds prior to the issuance of the policy, liens or claims resulting from the presence of the dirt could not be matters "not known" to CTI. Judgment should also not have been entered in CTI's favor on the Lyman Lumber Company lien because CTI settled the claim separately to protect itself from liability on another insurance policy.
 
 II.
 
 26
 The judgment the RTC appeals from is based both on CTI's successful motion for judgment as a matter of law and the jury verdict on the policy exclusions question. We review the grant or denial of a motion for judgment as a matter of law de novo, using the same standard employed by the district court. Jackson v. Prudential Ins. Co., 736 F.2d 450, 452-53 (8th Cir.1984). The motion can be granted "if, under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). If reasonable minds could differ about the import of the evidence, the motion should be denied. Id. at 251, 106 S.Ct. at 2511-12. We affirm a jury verdict unless, viewing the evidence in the light most favorable to the prevailing party, we conclude that a reasonable jury could have not found for that party. Hicks v. Capitol Amer. Life Ins. Co., 943 F.2d 891, 893-94 (8th Cir.1991); see also Keenan v. Computer Associates Int'l, 13 F.3d 1266, 1269-70 (8th Cir.1994). Whether an issue was properly before the jury, however, is a legal question which we review de novo. Hicks, 943 F.2d at 893.
 
 
 27
 Under Minnesota law, which the parties agree applies, there are several relevant rules of contract construction. The correct interpretation of a clause in an insurance policy is a question of law, which is reviewed de novo. Haarstad v. Graff, 517 N.W.2d 582, 584 (Minn.1994); State Farm Ins. Co. v. Seefeld, 81 N.W.2d 62, 64 (Minn.1992). An insurance contract is to be construed as a whole. Henning Nelson Constr. Co. v. Fireman's Fund Amer. Life Ins. Co., 383 N.W.2d 645, 652 (Minn.1986). Provisions limiting liability are to be strictly construed against the insurer, and where a claim is arguably within the policy's coverage the "insurer has the burden of proving that a policy exclusion applies." Seefeld, 481 N.W.2d at 64; see also Brown, 634 F.2d at 1107. Any ambiguity in the language of an insurance policy must be resolved against the insurer and in accordance with the reasonable expectations of the insured. Columbia Heights Motors, Inc. v. Allstate Ins. Co., 275 N.W.2d 32, 35 (Minn.1979); Caledonia Community Hosp. v. St. Paul Fire & Marine Ins. Co., 307 Minn. 352, 239 N.W.2d 768, 770 (1976); Northwest Airlines, Inc. v. Globe Indem. Co., 303 Minn. 16, 225 N.W.2d 831, 837 (1975).
 
 A.
 
 28
 Judgment as a matter of law was entered in CTI's favor on the basis that exclusion 3(a) precludes coverage. On appeal the RTC argues that the facts of this case do not fall within the scope of that exclusionary clause.
 
 
 29
 The policy does not define the words used in clause 3(a)--"created, suffered, assumed, or agreed to"--but a number of courts have considered such an exclusionary clause, with not inconsistent results. This type of exclusion bars coverage where there has been misconduct or inequitable behavior on the part of the lender, where the lender assumes or agrees to liens, or where the lender stands to receive an inequitable windfall if the insurer settles lien claims in order to protect the mortgage priority. Brown v. St. Paul Title Ins. Co., 634 F.2d 1103, 1107 n. 8 (8th Cir.1980); see also American Sav. & Loan Ass'n v. Lawyers Title Ins. Corp., 793 F.2d 780, 784 (6th Cir.1986); Joel E. Smith, Annotation, Title Insurance: Exclusion of Liability for Defects, Liens, or Encumbrances Created, Suffered, Assumed, or Agreed to by the Insured, 87 A.L.R.3d 515 (1978). Courts "have not permitted the insurer to avoid liability if the insured was innocent of any conduct causing the loss or was simply negligent in bringing about the loss." Brown, 634 F.2d at 1107 n. 8.
 
 
 30
 American Savings & Loan Association v. Lawyers Title Insurance Corporation, 793 F.2d 780 (6th Cir.1986), involved interpretation of a title insurance exclusionary clause identical to 3(a). In that case the lender issued a loan which it thought sufficient to fund completion of a construction project, but required the developer to furnish any additional funds which might become necessary. After the developer was unable to pay subcontractors and did not furnish additional funds, the lender settled lien claims and brought suit against the insurer for reimbursement. The insurer contended that exclusion 3(a) applied: the lender was responsible for the liens; it had undertaken the risk that the borrower would not find funds to complete the project if cost overruns occurred.
 
 
 31
 The district court held for the insurer, but the Sixth Circuit reversed, concluding that the lender's losses were covered by the policy and not excluded. It reasoned that the exclusionary clause does not apply unless the insured does more than merely "financ[e] only a portion of the construction project rather than funding the full actual completion cost." Id. at 784. The appellate court reviewed the case law on the meaning of "created," "suffered," "assumed," and "agreed to," and concluded that all the terms contain "some degree of intent," as opposed to inadvertence or negligence. Id. Furthermore, interpretation of the clause "often turns on notions of equity." Id. Since the lender put up the full amount of its loan commitment, the clause did not apply. Id. at 785. It distinguished the result in Bankers Trust Company v. Transamerica Title Insurance Company, 594 F.2d 231 (10th Cir.1979), where recovery by the lender would have amounted to extra enrichment since it had not put up all its committed loan funds.
 
 
 32
 The Eighth Circuit has had at least one occasion to examine an exclusion like 3(a); that was in Brown v. St. Paul Title Insurance Company, 634 F.2d 1103 (8th Cir.1980). There the lender stopped funding a construction project when the developer defaulted on the loan agreement by not making an interest payment. Even though the lender had not disbursed the full amount of its loan commitment, it refused to advance additional funds to the insurer, who was the disbursing agent, to pay for work done prior to the default. Liens arose as a result which the lender settled. It then sought to recover under the policy the amount it had paid in settlement.
 
 
 33
 Because the Brown lender had refused to advance committed loan funds, payment under the policy would have allowed it to escape accountability for events over which it had responsibility and control. The liens were therefore "created or suffered by" the lender. See id. at 1110; American Sav. & Loan Ass'n, 793 F.2d at 784-86 (discussing Brown ). Otherwise the lender, who had retained committed loan funds, would have unfairly recovered from the insurer the settlement payment necessitated by its own conduct. It would have received an "unwarranted windfall."
 
 
 34
 CTI believes that Brown stands for the proposition that an insured causes liens when it fails to provide sufficient funds to complete a construction project. This interpretation of Brown is overly broad; it goes beyond the facts and holding of that case. Unlike Murray, the Brown lender held back committed loan funds earmarked to pay for already completed work, thus guaranteeing that mechanic's liens would arise. In this sense it did "cause" the liens. See also Bankers Trust, 594 F.2d 231 (holding that where payment is not made up to the amount of the loan commitment, mechanic's liens are considered to be created or suffered by the insured lender).
 
 
 35
 In this case Murray did not hold back funds like the lenders in Bankers Trust and Brown. Murray in fact expended more than the $11,900,000 it had committed for the loan in order to see the project completed. It did not receive an unwarranted windfall or behave inequitably by advancing the funds. See Brown, 634 F.2d at 1107 n. 8; American Sav. & Loan Ass'n, 793 F.2d at 784. By advancing funds to pay for work already completed, Murray eliminated potential lien claims. Moreover, it took other steps to see that liens would not arise, including foregoing interest payments and seeking additional funds from the developer, which gave up development fees in order to pay subcontractors.
 
 
 36
 CTI argues that Murray "created" the liens by failing to allocate funds for retainage when it rearranged the construction budget to pay for overruns. By rearranging funds, however, Murray enabled the project to move forward while the developer attempted to find another buyer who could complete the work. Reallocation also freed up funds to pay for completed work, thus preventing potential liens from arising. Murray's decision not to hold back funds for retainage was not what caused the mechanic's liens. Because of the developer's inability to fund the project completely, lien claims would have arisen anyway.
 
 
 37
 CTI seeks to bolster its position on exclusion 3(a) by invoking Murray's obligations under the disbursement agreement. The policy endorsement exempts from coverage loss or damage resulting from Murray's "failure to comply with or to enforce the provisions of [the disbursement agreement] which relate to the disbursement of the proceeds of the loan." During its closing argument at trial, CTI asserted without explanation that Murray violated the disbursement agreement by failing to enforce the construction loan agreement. These were two separate agreements: the disbursement agreement was entered into in August 1987 in connection with issuance of the endorsement, while the construction loan agreement between Murray and the developer was entered into in July 1987. CTI also claimed that Murray violated the disbursement agreement by failing to provide the funds necessary to complete the project.
 
 
 38
 Our review of the record and the disbursement agreement indicates that CTI did not meet its burden of showing that Murray failed to enforce or to comply with the agreement, however. The terms of the disbursement agreement did not require Murray to enforce the construction loan agreement or to provide the funds necessary to complete the project. Instead, it required Murray to provide the funds to pay for each disbursement it authorized. Murray apparently met that obligation. Just as the Tenth Circuit was unable to find certain provisions in the Bankers Trust disbursement agreement which the lender sought to rely on, 594 F.2d at 232-33, we are unable to locate in this agreement the requirements alleged by CTI.
 
 
 39
 CTI argues that the language in the disbursement agreement stating that it assumed no liability "that sufficient funds would be available for completion" should be construed to mean that there is no coverage for liens arising from insufficient funds. This is not what the language says, however, and any ambiguity must be resolved against the insurer. More importantly, the disbursement agreement explicitly states that it does not affect coverage under the title insurance policy. CTI suggested at oral argument that the disbursement agreement clarifies the policy, but there is no statement in the policy or the disbursement agreement indicating that this was the intent of the parties. CTI also relies on evidence that it repeatedly told Murray it risked losing coverage if it funded cost overruns, but warnings about potential loss of coverage do not change policy terms.
 
 
 40
 The insurer's attempt to interpret the language in the agreement broadly would mean the endorsement would provide no coverage unless the insured itself put up sufficient funds to complete the project. Since there would be no need for coverage under those circumstances (fully paid subcontractors would not file lien claims), this interpretation would effectively nullify the mechanic's lien coverage secured by the endorsement. Such an interpretation would be contrary to Minnesota law, which requires courts to construe ambiguity against the drafter and in accordance with the reasonable expectations of the insured. Caledonia Community Hosp., 239 N.W.2d at 770. The policy as originally issued by CTI did not cover liens arising after the policy date so Murray sought and obtained the endorsement. It could not reasonably have expected the disbursement agreement to nullify the endorsement.
 
 
 41
 The district court erred in not granting the RTC's motion for judgment as a matter of law and in granting judgment in favor of CTI. In ruling on the motion the court referred generally to Murray's inattention and direct and indirect decisions, but it did not relate these actions to the legal standard which it later gave in its instructions. It did not explain what in its view amounted to intentional misconduct, inequitable dealings, or implied assumption or agreement to the liens other than to say that Murray undertook the risk of the liens by funding cost overruns. It concluded that this was not an insured risk under the policy. This conclusion was similar to an argument rejected in American Savings & Loan Association, where the Sixth Circuit held that the risk that liens would arise "because of underfunding on the project" was a risk covered by the policy and not excluded under 3(a) because "general rules of insurance contract construction, as well as the extreme breadth of the exclusion under [the insurer's] interpretation" militate against the insurer's interpretation. 793 F.2d at 782.
 
 
 42
 The language in exclusion 3(a) is ambiguous, as evidenced by the Sixth Circuit's attempt to define each word by extra-policy definitions, see American Sav. & Loan Ass'n, 793 F.2d at 784, and it should therefore be construed against CTI. Caledonia Community Hosp., 239 N.W.2d at 770. One commentator who has collected and analyzed many cases dealing with the clause and the meanings given to its words concluded that where the defects or liens were caused by "deliberate, dishonest, illegal, or inequitable dealings by the insured, there is no coverage." Joel E. Smith, Annotation, Title Insurance: Exclusion of Liability for Defects, Liens, or Encumbrances Created, Suffered, Assumed, or Agreed to by the Insured, 87 A.L.R.3d 515, 520 (1978). Representative examples in the annotation show affirmative misconduct such as the insured's acting in "positive bad faith" to divert property to its own benefit through fraud, undue influence, schemes to gain illegal profits, and breach of fiduciary duty.
 
 
 43
 In this case CTI did not meet its burden of proving that exclusion 3(a) applies, and the exclusion should not have been presented to the jury. Murray did not engage in affirmative misconduct or intentionally cause liens. It did advance funds for cost overruns and reallocate the construction budget in the attempt to complete the project. Its actions were not inequitable, however, and coverage would not be an unwarranted windfall. See Brown, 634 F.2d at 1110. Unlike the lenders in Bankers Trust and Brown it advanced its full loan commitment, just as the insured did in American Savings & Loan Association. Murray not only funded the full loan amount, but furnished additional funds. It also sought more funding from the developer and gave up interest payments. It did what it could to minimize the risk of liens under the circumstances it faced. The evidence may well have shown poor judgment or even negligence by Murray, but that is not enough to trigger clause 3(a). See Brown, 634 F.2d at 1107 n. 8. Murray attempted to keep the project going forward, but it did not clearly "create, suffer, assume or agree to" any mechanic's liens.
 
 
 44
 It has not been shown that "what was so clearly intended to fall within the coverage of the insuring clause was also excluded from coverage by the exclusionary clause." American Sav. & Loan Ass'n, 793 F.2d at 783. CTI asserts that coverage is excluded because Murray violated the provisions of the disbursement agreement, but it has failed to establish that Murray did so. The disbursement agreement does not say all that CTI would read into it. While the agreement indicated CTI assumed no liability for insufficient funding for the project, it also stated that it did not limit the policy coverage. After a careful review we conclude the RTC is entitled to judgment as matter of law that exclusion 3(a) does not apply.
 
 B.
 
 45
 The RTC argues that the jury should not have been permitted to consider exclusionary clause 3(b) because the clause is inapplicable as a matter of law. It excluded coverage for "[d]efects, liens, encumbrances, adverse claims or other matters" not known to CTI if Murray failed to disclose them in writing. The RTC claims the clause does not apply to site conditions, but rather involves liens and other title defects. In any event, says the RTC, the exclusion does not apply because CTI had notice of the mounds of dirt on the property before issuing the policy. This meant that under Minnesota law there might be preexisting liens. CTI asserts in opposition that clause 3(b) excluded coverage because Murray knew about the existence of the mounds of dirt and did not notify CTI in writing.
 
 
 46
 It is not disputed that CTI was aware that road construction had occurred, and that it had an independent engineer sent to inspect the site the morning before the policy was issued. It received and initialed the engineer's report, which mentioned "boundary monumentation," before issuing the policy. CTI thus had actual knowledge of the possible existence of visible improvements to the property which might have given lien claims priority over the mortgage under Minnesota law. See Minn.Stat. Sec. 514.05.
 
 
 47
 We need not decide whether site conditions fall within the general category encompassing "defects, liens, encumbrances, and adverse claims and other matters" because exclusion 3(b) by its language is limited to matters not known to CTI. While it is true that the clause puts some responsibility to give notice on the insured, it is clear in the clause itself that the notice requirement only applies if the information is "not known to [CTI] and not shown by the public records." CTI may not avoid coverage by relying on exclusion 3(b) since the engineer's affidavit gave it actual knowledge of the reported "boundary monumentation" before it issued the policy. Clause 3(b) is inapplicable as a matter of law.
 
 C.
 
 48
 In sum, we conclude that judgment was erroneously entered in favor of CTI because the policy exclusions did not apply to the circumstances, and the RTC was entitled as a matter of law to recover under the policy the amount it paid in settlement.[10] The judgment of the district court is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 CTI brought this action in state court, and the RTC removed pursuant to 28 U.S.C. Sec. 1441. Jurisdiction exists under the Financial Institutions Reform, Recovery, and Enforcement Act, 12 U.S.C. Sec. 1819(b)(2)(A), and 28 U.S.C. Sec. 1331
 
 
 [2]
 Exhibit III also required that CTI be furnished with statements from the developer and general contractor disclosing "all persons with whom either had contracted to furnish services, labor or materials for the Project, the amount of each such contract, including additions and other changes, the amounts paid to date, the amounts being requested for payment in the current disbursement and the balance due on each such contract."
 
 
 [3]
 CTI also obtained indemnity agreements from Tealwood Associates and Liebold
 
 
 [4]
 Murray employee Tom Lueder testified at trial that he had visited the site in May 1987 and noted that work had occurred on a road near the property. He also saw mounds of vegetation-covered dirt on the property. Dorwart testified that she had not noticed the dirt
 
 
 [5]
 The RTC asserts, and CTI does not dispute, that the overruns were caused by the city's restrictive reinterpretation of its building code, bad weather, and overbilling or mistakes by suppliers and subcontractors
 
 
 [6]
 CTI does not dispute Murray's estimation of the additional cost delay would have caused
 
 
 [7]
 Other claims were later added in this case, and CTI also filed an additional action. The RTC filed counterclaims against CTI based on the policy and negligence. CTI amended its complaint to include a claim of fraud, and filed a complaint against McCombs, Frank, Roos Associates, seeking contribution and indemnification for any recovery by the RTC in negligence. CTI also brought a second declaratory action against the RTC to obtain an equitable lien and constructive trust on a portion of the RTC interest in the Tealwood property
 The district court consolidated the actions, and severed CTI's declaratory judgment claim to be tried first. It also disposed of the counterclaim for negligence, granting summary judgment to CTI. After a jury trial, final judgment was entered in CTI's favor on its original claim pursuant to the district court's finding under Fed.R.Civ.P. 54(b) that there was no just reason for delay. After the RTC's appeal was filed, CTI and the RTC stipulated that CTI's claims for fraud and for an equitable lien and a constructive trust would be dismissed without prejudice.
 
 
 [8]
 No issue related to the duty to defend is before us on this appeal
 
 
 [9]
 The verdict form, to which CTI did not object, made no reference to the endorsement although it was mentioned once in the court's instructions
 
 
 [10]
 We therefore need not consider any issue related to CTI's separate settlement of the claim of Lyman Lumber Company