# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2368

_____

Shaw Hofstra & Associates,                    *
                                              *
              Plaintiff – Appellee,           *
                                              *    Appeal from the United States
     v.                                       *    District Court for the Western
                                              *    District of Missouri.
Ladco Development, Inc.,                       *
                                              *
              Defendant – Appellant.          *

_____

Submitted: February 16, 2012
Filed: March 12, 2012

_____

Before LOKEN, BYE, and MELLOY, Circuit Judges.

_____

BYE, Circuit Judge.

This case concerns the payment for architectural services provided by Shaw Hofstra & Associates (SHA) to Ladco Development, Inc. (Ladco) in conjunction with a large office building project. In its breach of contract claim, SHA contends it was not paid for the services it completed under the project. The district court[1] denied Ladco's motion for summary judgment, and the case proceeded to trial. Ultimately, the jury found in favor of SHA and assessed damages of $250,000. In this appeal, Ladco contends this court should reverse the district court's denial of its motion for

_____

[1]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

judgment as a matter of law and remand the case for entry of judgment for SHA and against Ladco, but only for $25,617.50 in unpaid invoices, rather than the $250,000 awarded by the jury. In the alternative, Ladco requests a new trial. We affirm.

I

On August 28, 2007, SHA, an architectural firm, submitted a written "fee proposal" to Ladco to provide architectural services for a 75,000 square foot multi-tenant office building project in Kansas City, Kansas. The proposal, submitted by SHA owner Craig Shaw to Ladco Development Manager Mike Belew, was divided into three separate scopes of services, with three corresponding fee structures.

The first part, titled Site Development Plan/TIF Process, pertained to obtaining the requisite governmental approvals to build the project, and it covered the design of the project to the point the project could be submitted to the city for approval and consideration for tax and other incentives. In return for the site planning, architectural concept and presentation drawings, landscape preliminary design drawings, and coordination with the city planning department, this scope proposed a flat fee of $35,000, which was based on the number of projected hours involved in the scope. The scope also provided "SHA shall invoice against the overall estimate on a percentage completion basis at a standard billing rate of $100.00/hr." J.A. at 25.

The second part, titled Construction Documents, concerned architectural and engineering services for the design and construction of the building. This scope proposed "a percentage based fee of 6.0% of the Construction Cost assuming a projected cost of $92.00/sq. ft. for the building shell." Id. Instead of providing hourly rates, the second part divided the services into five phases, each with a corresponding percentage of the overall fee:

| | |
|---|---|
| Schematic Design Phase | 15% |
| Design Development Phase | 20% |
| Construction Document Phase | 40% |
| Permitting and Sub-Contractor Bidding Phase | 5% |
| Construction Administration Phase | 20% |

Id. This scope also included a $7,500 credit for schematic design work included in the $35,000 fee for part one.

The third part, titled Tenant Finish Documents, proposed a fee of $0.12 per square foot for "Initial Space Planning as Marketing to Secure Tenant." Id. Under this scope, the parties planned for SHA to design the tenant space, with future tenants being able to separately contract with SHA for further work if they desired.

The last paragraph of the fee proposal stated: "Upon acceptance of this proposal SHA/SDC will prepare a standard AIA contract for the project. We ask that you sign below and on the attached Statement of Intent and return to SHA prior to SHA/SDC commencing with the services described above." Id. at 26.[2] The Statement of Intent provided SHA would work at "standard hourly rates and under the terms and conditions contained in this proposal until such time as a final agreement is in place or until SHA is notified that its services are no longer needed." Id. at 27. Belew and Shaw signed the proposal, and Belew signed the statement of intent, on September 12, 2007.

Shortly thereafter, SHA began work on the site development plan, design of the three-story building, and an initial space plan for a law firm that would occupy 50,000 square feet of the building. Shaw anticipated it would take six weeks to complete the schematic design phase, which he testified he completed on the initial three-story

---

[2]An AIA contract is a form agreement developed by the American Institute of Architects outlining the responsibilities of the owner and the architect.

75,000 square foot building. However, Shaw was tasked with multiple redesigns of the project due to certain tenants being relocated within the building for various reasons. At the same time, Ladco was recruiting additional tenants that enlarged the scope of the project. As a result, Shaw testified SHA completed schematic design multiple times over the course of several months:

> In my opinion [the documents shown to the jury] constitute[] schematic design about three times. We described the building, its size, its relationship to the site, its functions and how tenants could fit into it for an initial building. The criteria changed. Another building joined us. We redid the schematics to accommodate that. The rules changed again and we couldn't use a portion of the site so we redid the buildings in the site plan with that scheme. Then the insertion of the parking into the building caused yet another change. So, yes, I think we did schematic design over and over.

Trial Tr. vol. 2, at 238-39.

In March 2008, SHA and Ladco executed a letter agreement. Because of the increased interest prospective tenants had in relocating to the site, the project had grown from one 75,000 square foot building and a parking garage to an 80,000 square foot building and an additional 170,000 square foot building, and an 800 stall parking garage. The new proposal for the larger project expanded the scope of work, and SHA's fee for the entitlement process was increased from $35,000 to $55,000. The letter agreement included a provision noting it "supersedes all prior agreements[.]" J.A. at 296. However, Shaw testified his intention was to have the letter agreement displace only part one of the fee proposal, not part two, because it essentially expanded the scope of work and fee included in the first part of the proposal.

On March 27, 2008, Shaw sent an email to Steve Bessenbacher, a Ladco development manager, suggesting the proposed schedule was impossible to meet. Bessenbacher responded the project would be a challenge, but it would not be

impossible, and he noted Belew had brought up using another architectural firm, Bell Knott & Associates (BKA) to add resources. During this time, the project continued to grow even more. By early April 2008, it had increased to an eight-story building containing 240,372 square feet, including 103,890 square feet of parking for 343 vehicles; a five-story, 165,675 square foot building including a preschool; and a separate 137,624 square foot parking garage for 348 vehicles. On April 22, 2008, Belew informed Shaw by email that BKA would take over as lead architect on the project, and SHA would be responsible for interiors, tenant space, and streetscape.

Pursuant to discussions between BKA-head Kerry Knott and Belew, Knott stated in an April 28, 2008, email to Belew that BKA's fee would be six percent of the general construction cost of the entire project, which Belew testified was to be the same fee originally proposed to SHA. On May 12, 2008, Shaw sent Knott a letter asserting SHA had completed 80 percent of the schematic design services of the project. Shaw calculated a fee of $320,000, based not on the hourly rate, but on the percentage in part two of the fee proposal. On May 20, 2008, Shaw sent a follow-up email to Knott confirming these terms and asserting the drawings, images, and supporting documents were copyright protected and the exclusive property of SHA.

After analyzing the drawings BKA previously obtained from SHA, Knott concluded SHA had completed 40 percent of the schematic design phase of the project, not 80 percent, although Knott did not have all of SHA's documents at the time of his May 22, 2008 report. On May 30, 2008, Bessenbacher sent an email to Shaw and Knott noting their review determined the schematic design portion was 40 percent complete. In the email, Bessenbacher stated a contract with BKA was near:

> As we are all aware, a key issue related to this agreement is Ladco's assessment of the percent detail of the SD [schematic design] portion as performed by Shaw Hofstra. After review by our counsel, we determined that the SD portion was at 40% complete. Per this determination, we have agreed to the following arrangement with Shaw

Hofstra in return for immediate, full release of the SD documents to Bell Knott.

Upon Ladco and Bell Knott executing the Architectural Services contract, Ladco will give a check made out to Bell Knott in the amount of 25% of the total invoice for 40% of SD. It would be our assumption that Bell Knott would serve as a conduit between Ladco and Shaw Hofstra, thus immediately forwarding the funds directly to Shaw Hofstra. An additional 25% of the total invoice will be paid under "net 30" terms under the same assumptions. The final 50%, as agreed upon in the Architectural Services contract, will be deemed "at risk" until construction financing is put in place, estimated to be late Summer 2008.

The split of the remaining 60% of SD will be determined solely between Bell Knott and Shaw Hofstra.

If you feel that the arrangement agreed upon is separate from this, please let me know. If we are in full agreement, please note that to the group. Once all have agreed, Craig, I would request that you forward the SD documents to Kerry today so that we can continue to keep moving forward.

J.A. at 29-30. In response, Shaw requested that someone at Ladco sign a hard copy of the email, and Ladco complied. On June 2, 2008, SHA delivered its drawings and computer aided design files to BKA.

Ultimately, Ladco and BKA never signed an architectural services contract, financing was never put in place, and the project was never built. In turn, while Ladco paid several invoices over the months submitted by SHA based on hourly rates, which cumulatively totaled over $100,000, Shaw testified SHA was never paid for the percentage of schematic design work it completed.

Consequently, SHA brought suit against Ladco for breach of contract, and later added a quantum meruit claim. In its complaint, SHA asserted it was entitled to

-6-

$170,171 based on the 40 percent of schematic design work it had completed, as well as $25,617.50 for six unpaid invoices for architectural and interior design services, for a total of $195,788.50.

Ladco moved for summary judgment based on the May 2008 email, arguing the email constituted a settlement agreement that contained conditions precedent to payment which were never met. The district court denied the motion, concluding there were disputed issues of material fact remaining "regarding the existence and terms of any contract[s] between the parties." Id. at 136. Prior to trial, Ladco proposed a verdict director, which asked the jury to decide only whether SHA was entitled to payment on the unpaid invoices. Ladco also objected to SHA's verdict director because it charged the jury with interpreting a contract between the parties. The district court entered an order, again concluding the parties' agreement was ambiguous. The court noted its "inability to divine whether and how much Plaintiff was entitled to be paid for its work led to the denial of Defendant's summary judgment motion." Id. at 529.

At trial, Ladco claimed Shaw demanded a fee for schematic design work based on the percentage in part two of the fee proposal, rather than proceeding according to the terms of the May 2008 email. Ladco moved for judgment as a matter of law, arguing the fee proposal stated SHA was to be paid at an hourly rate, the fee proposal was replaced by the March 2008 letter agreement, and both were replaced by the May 2008 email. The district court denied the motion. At the instructions conference, Ladco again objected to sending any contract to the jury to interpret, but argued in the alternative for a contra proferentem instruction because it claimed Shaw drafted the proposal. The court overruled Ladco's objection and denied its instruction request. Ultimately, the jury ruled in favor of SHA, assessing damages of $250,000.

After trial, Ladco renewed its motion for judgment as a matter of law on the same grounds as before, which the court denied, stating "Defendant's contention that

the evidence was insufficient to support a verdict for Plaintiff turns on its premise that the parties' contract was unambiguous. The Court adheres to its prior rulings on this issue: the contract was ambiguous and its interpretation was a matter for the jury to resolve." Id. at 608. Ladco appeals.

## II

Ladco raises two issues on appeal. It argues the district court erred by allowing the jury to interpret the parties' agreement, and it abused its discretion by refusing a requested contra proferentem instruction. We address each issue in turn.

A.      Whether the District Court Erred in Sending the Fee Proposal to the Jury

"We review de novo the grant or denial of a motion for judgment as a matter of law, using the same standards as the trial court." Penford Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 662 F.3d 497, 503 (8th Cir. 2011). "We draw all reasonable inferences in favor of the nonmoving party without making credibility assessments or weighing the evidence." Id. (internal quotation marks and citation omitted). "To sustain an entry of judgment as a matter of law, the evidence must point unswervingly to only one reasonable conclusion. This demanding standard reflects our concern that, if misused, judgment as a matter of law can invade the jury's rightful province." Id. (internal quotation marks and citation omitted).

Ladco's central argument is that the parties' contractual arrangement was a matter of law for the district court, rather than the jury, to decide. "Whether an issue was properly before the jury . . . is a legal question which we review de novo." Chicago Title Ins. Co. v. Resolution Trust Corp., 53 F.3d 899, 904 (8th Cir. 1995). "Under Missouri law, determining the meaning of an unambiguous provision is a question of law for the court, determined by giving language its plain and ordinary meaning without resort to extrinsic evidence." Weitz Co. v. MH Washington, 631

F.3d 510, 524 (8th Cir. 2011). "A contract is ambiguous when the terms are susceptible of more than one reasonable meaning." Id. "Interpretation of a contract is a jury question only when the court determines that the contract is ambiguous and that there exists a genuine factual dispute regarding the intent of the parties." Id.

Ladco argues the fee proposal should not have been sent to the jury because its terms were unambiguous and thus the interpretation was a matter of law for the court to decide. According to Ladco, SHA invoiced at standard hourly rates until it discovered it would not be lead architect on the project. In other words, Ladco asserts SHA interpreted the Statement of Intent as meaningless when it became disadvantageous to abide by it. Because the proposal was unambiguous, Ladco argues the court should have enforced the Statement of Intent, which only provided for hourly compensation, and granted judgment as a matter of law on SHA's percentage fee claim.

We disagree. First, "[t]o determine whether a contract is ambiguous the court must consider the entire written agreement and give words their ordinary and usual meaning." Union Elec. Co. v. Sw. Bell Tel. L.P., 378 F.3d 781, 786 (8th Cir. 2004). The Statement of Intent provided SHA would work at *standard hourly rates and under the terms and conditions contained in this proposal* until such time as a final agreement is in place or until SHA is notified that its services are no longer needed." J.A. at 27 (emphasis added). The parties advance competing contract principles in support of their interpretations of this provision. Ladco argues we must interpret this provision to give effect to the specific term dealing with hourly rates, rather than the broader language referencing the other terms and conditions of the proposal. See Phillips v. Authorized Investors Grp., Inc., 625 S.W.2d 917, 921 (Mo. Ct. App. 1981) ("[W]e give preference to the specific provisions over the general."). On the other hand, SHA offers support for its theory in the principle that "each term of a contract is construed to avoid rendering other terms meaningless," which would effectively

occur if we accepted Ladco's interpretation of this provision. <u>Dunn Indus. Grp., Inc. v. City of Sugar Creek</u>, 112 S.W.3d 421, 428 (Mo. 2003).

Given the language of the entire fee proposal, including the Statement of Intent and the separate scopes of services, the contract is susceptible to each of the meanings argued by the parties. Namely, it is reasonable to read the fee proposal in accordance with hourly or percentage-based compensation. Under either approach, determining the proper amount of compensation becomes particularly confusing under the circumstances, because SHA was tasked with replicating its efforts under separate scopes of services throughout the continual revisions and additions to the project.

Indeed, even the parties acted under varying interpretations. For several months, SHA submitted hourly-based invoices that Ladco paid in full, which accords with Ladco's interpretation of the fee proposal. Shaw admitted at trial at least some of the schematic design work was billed on an hourly basis in certain invoices. Nonetheless, when Shaw demanded to be paid based on the percentage of schematic designs SHA completed, Ladco agreed SHA was entitled to such compensation, even if it disputed the exact percent SHA had completed. <u>See</u> J.A. at 29-30 ("As we are all aware, a key issue related to this agreement is Ladco's assessment of the percent detail of the [schematic design] portion as performed by Shaw Hofstra."). We believe the parties' conduct is relevant to our interpretation of the contract, and supports a finding of ambiguity. <u>See</u> <u>Press Mach. Corp. v. Smith R.P.M. Corp.</u>, 727 F.2d 781, 785 (8th Cir. 1984) ("The surrounding circumstances at the time of contracting and the positions and actions of the parties are relevant to the judicial interpretation of the contract."); <u>Wilkinson v. Tarwater</u>, 393 S.W.2d 538, 543 (Mo. 1965) ("The construction that the parties place upon a contract or an agreement as evidenced by the acts and conduct is strong evidence of the real intention of the parties.").

In sum, "[u]nder Missouri law, the court must first determine as a matter of law whether a contract is ambiguous." <u>United States v. Green Acres Enters., Inc.</u>, 86 F.3d

-10-

130, 133 (8th Cir. 1996). The district court performed this task here, concluding the parties' agreement was ambiguous. Given the varying reasonable interpretations of the fee proposal's language, we agree.

"[O]nce a contract is deemed ambiguous, a question of fact arises and the issue is reserved for the jury." Lafarge N. Am., Inc. v. Discovery Grp. LLC, 574 F.3d 973, 981 n.3 (8th Cir. 2009); see also Weitz Co. LLC v. MacKenzie House, LLC, 665 F.3d 970, 976 (8th Cir. 2012) ("Because of this ambiguity, the issue was properly submitted to the jury, and this court will not overturn their reasoned verdict."); Baum v. Helget Gas Prods, Inc., 440 F.3d 1019, 1022 (8th Cir. 2006) ("Where the contract is textually ambiguous, a question of material fact exists as to the parties' intent, which is for a jury to resolve at trial."). Accordingly, because the fee proposal was ambiguous as to the parties' intent, the district court did not err in submitting it to the jury to make the necessary factual determination.

Finally, we address Ladco's contention that the proposal had been replaced by the May 2008 email, which should be interpreted as a matter of law because it was an unambiguous settlement agreement. Under the email, Ladco states two conditions precedent were not met: (1) no contract was entered between Ladco and BKA, and thus SHA's fee was unknown; and (2) financing was not obtained, and the email stated the final 50 percent was deemed "at risk" until such financing was put in place. Consequently, Ladco argues none of the payments in the settlement became due.

Notwithstanding the drastic inequity posed by adopting Ladco's argument, we disagree the email operated as an unambiguous settlement agreement that superseded the original fee proposal.[3] Looking to the language of the email, it begins by focusing

---

[3]Ladco also argues the fee proposal was superseded by the March 2008 letter agreement. We note Ladco appeared to take the opposite position in its motion for summary judgment, where it noted the letter agreement was "for some additional limited services related to the Project," but "[t]he amount in dispute is relatively small

-11-

on the "contract for Architectural Services" that was to be entered into between Ladco and BKA. J.A. at 29. Ladco then stated, "a key issue related to this agreement is Ladco's assessment of the percent detail of the [schematic design] portion as performed by Shaw Hofstra." Id. Ladco indicated it would pay SHA based on a completion rate of 40 percent of the schematic design in exchange for SHA's release of the schematic design documents to BKA. SHA disputed Ladco's assessment that it only completed 40 percent of the schematic design work, and it never signed the purported settlement, although it ultimately turned over the documents to BKA.

Like the fee proposal above, it is unclear whether the parties intended to settle the schematic design compensation via the May 2008 email. "The issues of whether the parties entered into a contract and, if so, what terms are included in that contract, depend on what the parties actually said and did and not upon one party's own understanding." Muilenburg, Inc. v. Cherokee Rose Design & Build, LLC, 250 S.W.3d 848, 854 (Mo. Ct. App. 2008) (internal quotation marks and citation omitted). "The real intention of the parties is the universal rule of construction." Robson v. United Pac. Ins. Co., 391 S.W.2d 855, 861 (Mo. banc 1965). "Whether an unsigned writing constitutes a binding contract depends upon the intention of the parties, which is a question of fact that is seldom capable of direct proof." Heritage Roofing, LLC v. Fischer, 164 S.W.3d 128, 134 (Mo. Ct. App. 2005). This is the case here. Ultimately, while another jury may agree with Ladco that SHA was only entitled to be paid based on its hourly rates, "we simply cannot say, on the basis of the record before us, that [Ladco] is entitled to judgment as a matter of law on this claim[.]" Bone v. Refco, Inc., 774 F.2d 235, 245 (8th Cir. 1985). "[R]easonable minds could differ about the import of the evidence," and thus the district court properly denied the

---

and the issue is not the subject of this motion for summary judgment." J.A. at 102. In any event, even if this argument is not waived by Ladco's failure to raise it below, Copeland v. ABB, Inc., 521 F.3d 1010, 1015 n.5 (8th Cir. 2008), the letter agreement is inapposite to the current dispute because it is almost entirely silent on the schematic design work contemplated by the second scope in the fee proposal.

motion for judgment as a matter of law. Chicago Title Ins. Co., 53 F.3d at 904. We affirm the district court.

B.     Whether the District Court Abused Its Discretion by Refusing to Give a Contra Proferentem Instruction

"We review for abuse of discretion the district court's refusal to submit a requested instruction." Powell v. TPI Petroleum, Inc., 510 F.3d 818, 823 (8th Cir. 2007). "A contra proferentem instruction is appropriate where one party drafts and controls the contractual terms of a contract; in such situation, a contra proferentem instruction tells the jury to construe any ambiguity in such contract against the drafter." Porous Media Corp. v. Midland Brake, Inc., 220 F.3d 954, 960 n.8 (8th Cir. 2000). The contra proferentem rule "is applied more rigorously in insurance contracts than in other contracts in Missouri." Burns v. Smith, 303 S.W.3d 505, 509 (Mo. 2010) (internal quotation marks and citation omitted).

In this case, Ladco requested a contra proferentem instruction directing the jury to adopt Ladco's contention of the contract in rendering its verdict, because Ladco claimed Shaw drafted the proposal. The court denied the instruction, stating: "I want both sides here to have ample opportunity to argue your theory of the case to the jury. I'm not going to restrict any argument with rulings of law that essentially result in a directed verdict for one side or the other." Trial Tr. vol. 3, at 444. Ladco argues the refusal of the instruction resulted in the jury's misunderstanding of its duty to interpret the fee proposal against SHA. Had the jury been so instructed, Ladco claims the verdict likely would have been different.

We agree with the district court because there was not sufficient evidence as to who drafted the Statement of Intent, contrary to Ladco's assertion. Shaw testified, "Statement of intent is not a document that we use once every ten years I think. I'm not sure whether Mr. Belew provided that or we provided it. I simply don't

-13-

remember." Trial Tr. vol. 2, at 317. When pressed on some modifications made to the Statement of Intent, Shaw stated, "Again, I either drafted it or Mike drafted it. I certainly must have drafted that line or added that line." Id. at 319. While Ladco stresses that Shaw "admitted he must have drafted at least some of the statement of intent," Appellant's Reply Br. at 9, this, standing alone, would be insufficient to give the instruction, because it necessarily means Belew or Ladco drafted some of the language. It would contravene the purpose of the instruction if both parties drafted the provision in part.

Accordingly, the court acted within its province in denying the request because there was not sufficient evidence in the record to form a basis for the instruction. Cf. Swift & Co. v. Elias Farms, Inc., 539 F.3d 849, 854 (8th Cir. 2008) ("A jury should be instructed to consider the rule that ambiguous agreements are construed against the drafter only if it is unable to determine the intent of the parties based on all of the evidence."); McClure v. Am. Fam. Mut. Ins. Co., 223 F.3d 845, 858 (8th Cir. 2000) (concluding the court did not abuse its discretion in denying a contra proferentem instruction based, in part, on the lack of evidence on argument on the issue). Moreover, we note the parties appeared to be at equal bargaining power. See Porous Media Corp., 220 F.3d at 960 (concluding a party was not entitled to a contra proferentem instruction because, in part, the parties had equal bargaining power). Because the court did not abuse its discretion, we affirm its denial of the requested instruction.

## III

For the foregoing reasons, we affirm the district court's judgment.

_____